In re PUBLIC PARK AT CONEY ISLAND, IN CITY OF NEW YORK.

(Supreme Court, Appellate Division, Second Department.    March 17, 1916.)

1. EMINENT DOMAIN ⬳237(5)—COMPENSATION—COMMISSIONERS' AWARD—AFFIRMANCE.

In a condemnation proceeding by the city of New York, which acquired land for the opening and extending of a public park at Coney Island, where a parcel taken fronted a public street, the difference between an award of $377,247 and the city's highest estimate of $217,652 was so comparatively small that, within the wide latitude conceded to the commissioners of appraisal, the court would not interfere with it.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 611, 612; Dec. Dig. ⬳237(5).]

2. EMINENT DOMAIN ⬳202(2, 3)—COMPENSATION—EVIDENCE.

The value of lots fronting upon a public street can have at least no conclusive bearing upon the value of lots having no such frontage, or which are the rear portions of plots whose frontage, untaken, still leaves ample depth for lot development.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. § 541; Dec. Dig. ⬳202(2, 3).]

3. EMINENT DOMAIN ⬳233—COMPENSATION—COMMISSIONERS OF APPRAISAL—BASIS OF AWARD.

Upon a hearing by commissioners of appraisal upon their preliminary report in a condemnation proceeding by a city, the commissioners, at the request of the counsel for the city, properly stated the basis upon which they made their awards for certain parcels.

[Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. ⬳233.]

4. EMINENT DOMAIN ⬳237(5) — COMPENSATION — EXCESSIVE AWARD — EVIDENCE.

On a city's appeal from orders confirming a report of commissioners of appraisal awarding damages for three lots at Coney Island, aggregating about 12 acres, practically bare of improvements, taken by the city for a public park, on the evidence, consisting of expert testimony, records of sales, etc., awards for such parcels aggregating exclusive of interest and improvements, $1,757,627, *held* so largely excessive that justice required the court to set aside the report as to such parcels and to remit the matter to new commissioners of appraisal.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 611, 612; Dec. Dig. ⬳237(5).]

5. EMINENT DOMAIN ⬳233—COMPENSATION—HEARING BY COMMISSIONERS—EVIDENCE.

On a hearing by commissioners of appraisal to fix awards for parcels of land condemned by the city, the commissioners' demand for an option given to the city to purchase the awards for a certain sum was improper, as even a bona fide offer made to the owner to purchase would be incompetent evidence in his favor.

[Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. ⬳233.]

---

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. EMINENT DOMAIN ⊚⇒233—COMPENSATION—HEARING BY COMMISSIONERS—
   PRODUCTION OF APPRAISALS.
   On such hearing, the city's failure to produce on the commissioners'
   demand any appraisals which it might have obtained at the time of the
   receipt of such option warranted no adverse inference against the city,
   and should not have been commented upon by the commissioners.
   [Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. ⊚⇒233.]

7. EMINENT DOMAIN ⊚⇒233—COMPENSATION—HEARING BY COMMISSIONERS—
   APPRAISAL OUTSIDE TESTIMONY.
   On such hearing, the obtaining of information from outside sources
   should, in the exercise of the commissioners' discretion, have been limited
   to the ascertainment of already existing facts, such as sales or leases,
   and should not have been extended to the very class of evidence which
   the parties had been placing before the commissioners.
   [Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. ⊚⇒233.]

8. EMINENT DOMAIN ⊚⇒233—COMPENSATION—HEARING—EVIDENCE.
   In such case, the action of the commissioners of appraisal in declining
   to receive two appraisals of experts tendered by the city, and in insisting
   that such experts should be produced for examination and cross-examina-
   tion under oath, was proper.
   [Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. ⊚⇒233.]
   Carr, J., dissenting in part.

Appeal from Special Term, Kings County.

In the matter of the application of the City of New York relative to
acquiring title, etc., for the opening and extending of a public park at
Coney Island, etc. From two orders of the Special Term, the city of
New York appeals. Order first appealed from reversed, so far as
relating to parcels 1, 2, and 3, and otherwise affirmed; and order sec-
ondly appealed from entirely reversed, and matter as to parcels 1, 2,
and 3 remitted to William C. Beecher, Esq., and others, as new com-
missioners of appraisal.

Argued before JENKS, P. J., and THOMAS, CARR, MILLS, and
RICH, JJ.

L. Howell La Motte, of New York City (Joel J. Squier, of New
York City, on the brief), for appellant.

George W. Wingate, of New York City, for respondent Prospect
Park & C. I. R. Co.

C. Walter Randall, of New York City, for respondent Huber.

T. Ellett Hodgskin, of New York City, for respondent Balmer's Es-
tate.

MILLS, J. This is an appeal by the city of New York from two
orders made at the Kings County Special Term, confirming the re-
port of commissioners of appraisal, which awarded damages for four
certain parcels of land at Coney Island, taken by the city for a pub-
lic park. The condemnation and appraisal included also two certain
other parcels, designated as No. 1–A and No. 1–B; but, as the ap-
pellant does not ask here to have the awards for those parcels reviewed,
I do not consider them. Although the notices of appeal are general, I
find it stated in one of the briefs that the city subsequently withdraw

its appeal as to those two parcels; but I find no such withdrawal in the record. The brief for the city, however, asks consideration only for the other awards, which were made for parcels 1, 2, 3, and 4.

As to parcels 3 and 4, the title vested in the city on April 14, 1912, when the original commissioners of appraisal took and filed their oaths; but as to parcels 1 and 2 title was, by resolution of the board of estimate and apportionment, made to vest in the city six months later, namely, September 4, 1912. The order appointing the original commissioners was made at the Kings County Special Term February 27, 1912. The commissioners began their hearings April 8, 1912, and signed their report April 5, 1915, having been engaged in their work a period of about three years. By statute each award had to include interest from the day title to the parcel vested in the city.

The land, when acquired by the city, was substantially bare of improvements, as the buildings and perishable structures thereon had been destroyed by fire May 28, 1911, so that the great bulk of the awards was for the land alone and comparatively little for improvements.

At the time of the condemnation and vesting of title, plots 1 and 2 were owned by Joseph Huber, as trustee, subject to several mortgages, under a declaration of trust, by which it appears that he held the title as trustee for various parties interested as mortgagees and otherwise in the Dreamland Corporation, which for several years prior to the fire had owned the lands and used them for the purposes of the amusement place known as Dreamland. The award for said parcels was made to him as trustee.

Parcel No. 3, at the time of vesting, belonged to the respondent, the Prospect Park & Coney Island Railroad Company, and the award is made to it, subject to certain mortgages. Parcel No. 4 at the same time belonged to Catherine A. Balmer. She died pending these proceedings, and the award for that parcel was made to her executors, subject to certain mortgages.

The several plots, 1, 2, 3, and 4, adjoin each other and are situated in the heart of the amusement section of Coney Island, very near to the railroad station. From the evidence, it appears that Surf avenue is the leading thoroughfare of the locality and runs, generally speaking, east and west, approximately parallel with the ocean shore. At the east bound of the locality, West Fifth street runs north and south, across Surf avenue, and southerly to the water's edge. The block of land made up of the several plots, 1, 2, 3, and 4, lies on the west side of that street and is bounded on the east by that street 467 feet, on the north by a line 200 feet southerly from Surf avenue and nearly parallel therewith 997 feet, on the west by adjoining private property 740 feet, and on the south by the ocean. The other two parcels, No. 1-A and No. 1-B, not involved in this appeal, are easement rights appurtenant to lands between parcel No. 1 and Surf avenue, over a walk running through parcel No. 1, known as "Woolsey's Walk." Parcels 1 and 2 together form the westerly part of the Park Block and are on the north bound 443 feet, on the west bound 740 feet, on the east bound 692 feet, and on the south, along the water front, about

the same as on the north. The area of parcel No. 1 is 109,830 square feet, and that of parcel No. 2 is 203,395 square feet, making in both 313,115 square feet, which equals about 7.16 acres.

Plot No. 3 is the central part of the Park Block and is on the north bound 374 feet, on the east 491 feet, on the west 692 feet, and on the south and water front about the same as on the north, and contains 218,855 square feet, or a little over 5 acres.

Plot No. 4 is the easterly part of the Park Block and is on its north bound 180 feet, on the east, along the street, 467 feet, on the west 491 feet, and on the south or water front something less than on the north, and contains 74,240 square feet, or 1.7 acres. Hence the Park Block includes about 13.8 acres.

The report made the following awards for the land, without the interest:

| | | |
|---|---|---|
| For parcels 1 and 2........................................ | | $1,014,602 32 |
| "      "      3 ........................................ | | 743,024 97 |
| "      "      4 ........................................ | | 377,247 20 |
| Total ........................................ | | $2,134,874 49 |

Also, for interest on land awards:

| | | |
|---|---|---|
| On parcels 1 and 2.............................. | $155,741 46 | |
| "      "      3 .............................. | 136,345 08 | |
| "      "      4 .............................. | 69,224 86 | |
| | $361,311 40 | 361,311 40 |

Also, for improvements:

| | | |
|---|---|---|
| On parcels 1 and 2 .......................... | $ 20,900 00 | |
| Interest thereon .......................... | 3,208 15 | |
| On parcel 4, under title "For Expenses Incurred Prior to Vesting Title" .......................... | 23,897 24 | |
| Interest thereon .......................... | 4,385 14 | |
| | $ 52,390 53 | 52,390 53 |
| | | $2,548,576 42 |

Also, for the above-mentioned easement rights, viz.:

| | | |
|---|---|---|
| Parcel No. 1–A .............................. | $ 5,000 00 | |
| Interest thereon .............................. | 767 50 | |
| Parcel No. 1–B .............................. | $ 7,500 00 | |
| Interest thereon .............................. | $ 1,151 25 | |
| | $14,418 75 | 14,418 75 |
| Final total ........................................ | | $2,562,995 17 |

It therefore appears that, according to the report, the naked land taken for the park was to cost the city, at the date of taking $2,147,-374.49, and at the date of the report, $2,510,604.64.

The city duly filed objections to each such award. The court at Special Term, in the first order appealed from, confirmed the awards for parcels 1–A and 1–B (the easement rights), and also that for parcel No. 3; and the persons interested in the award for plot No. 4, except the city, having stipulated that such award be reduced by the sum of $20,873.24 and $3,830.24 interest thereon, that order also confirmed that award so reduced, the reduction leaving the award to

stand, principal and interest, at $450,050.96.  Such reduction was made in accordance with the opinion of the justice presiding at such Special Term, and was entirely, from the award, "for expenses incurred prior to vesting title," leaving that part of that award to stand thus:

For expenses, etc. ................................... $3,024 00
Interest thereon .................................. 554 90

    Total ........................................... $3,578 90
Instead of a total for the item of ............................ $28,282 38

The opinion at Special Term also held that the award made for parcels 1 and 2 ought to be reduced by $12,500, the amount of the above-mentioned awards for the easement rights, and $17,000, the approximate amount of an assessment upon those plots growing out of the then recent closing of West Eighth street, which formerly ran through them.  The persons interested in the award for those parcels, except the city, having stipulated to such reduction of the award, the Special Term, by the second order appealed from, confirmed the award so reduced as to parcels 1 and 2, which left that award to stand as follows:

For land ......................................... $985,102 32
Interest thereon .................................. 151,213 21
Improvements ..................................... 20,900 00
Interest thereon .................................. 3,208 15

                                                   $1,160,423 68

The action of the Special Term, however, did not reduce the land values as fixed by the commissioners, because the $12,500 easement award and the $17,000 for the assessment, were really, by the court, included in the land value of parcels 1 and 2 if treated, as well they might be, as incumbrances thereon to be paid off by the making of such deductions.  Hence the awards for the land still in effect stand as fixed by the report, namely:

Parcels 1 and 2............................................ $1,014,602 32
  "      3 ................................................. 743,024 97
         4 ................................................. 377,247 20

    Total ................................................. $2,134,874 49

Thus the city is now, by the report and the orders appealed from, called upon to pay for the land at the rate of $154,701 an acre, with interest thereon from the date of taking in 1912, viz., $2,134,874 divided by 13.8 acres.

As above stated, there is no question here about the awards for the easements; and I do not perceive that there is any real question about those made for the improvements upon parcels 1 and 2, or for the expenses incurred in reference to parcel 4.  Although the appellant's counsel, in his brief, claims that they are too large, I think that the evidence as to them was such that the decision of the commissioners should be accepted here.  Therefore I shall confine my further con-

sideration to the land damages other than the easements, the improvements, and such expenses.

The brief submitted by the learned counsel for the city is very long; but, while it is expressed in 11 different points, it presents, aside from reference to a certain option hereinafter separately discussed, only a single contention, namely, that the awards for the land damages or values are grossly excessive, far beyond what the greater weight of the evidence warranted. This contention presents the main question for consideration here.

The several claims appear to have been tried together by the commissioners. The appellant's counsel submits a table giving a summary of the estimates made by the several expert witnesses upon each side as to each parcel, the claimants having examined three such witnesses and the city two, and the claimants' witnesses having varied in personnel somewhat as to the different parcels. From that table, which appears to be correct, I make up the following comparison:

| Parcel. | City's Highest Estimate. | Claimant's Lowest Estimate. | Award. |
|---|---|---|---|
| 1 and 2............... | $449,225 76 | $1,252,460 00 | $1,014,602 32 |
| 3 ................... | 345,866 25 | 1,400,475 00 | 743,024 97 |
| 4 ................... | 217,632 05 | 710,000 00 | 377,247 20 |

From this comparative table it will be observed that the difference between the opposing estimates, at their nearest approach, is startling, altogether too large for a sincere difference of opinion between experts who appear upon both sides to have been competent and substantially equally so. Thus, as to parcels Nos. 1 and 2, the claimants' lowest estimate was nearly 2.8 times the city's highest; and the award was about .8 of the claimants' lowest and 2.26 of the city's highest. Evidently, as to those parcels, the commissioners regarded the claimants' estimates as much the more reliable.

As to parcel No. 3, the claimant's lowest was over four times the city's highest, and the award was about 53 per cent. of the claimant's lowest and a little over twice the city's highest. Here, apparently, the commissioners credited the experts of neither side.

[1] As to parcel No. 4, claimant's lowest estimate was 3.31 times the city's highest, and the award was nearly 1.28 times the city's highest and 63 per cent. of the claimant's lowest. Here the commissioners evidently credited more the city's witnesses. That parcel was the only one which fronted upon any public street, and was, I think, susceptible of more accurate estimate than the others. The difference between the award for it and the city's highest estimate is so comparatively small that I think that, within the well-known wide latitude conceded to such commissioners, we should not here interfere with their award, and therefore I shall give to it herein no further consideration.

[2] It seems to me, however, that the value of lots fronting upon a public street can have at least no conclusive bearing upon the value of lots having no such frontage, or which are, as here, the rear portions of plots whose frontage, untaken, still left to the claimants ample depth for lot development.

As to parcel 3, the difference between the award and each party's estimate was very great; and the same is true as to parcels Nos. 1 and 2.

[3] Upon the hearing held by the commissioners upon their preliminary report, they, at the request of the counsel for the city and over the objection of the claimants, very properly stated the basis upon which they made their awards for parcels 1, 2, and 3, namely, for the zone 300 feet deep back from the ocean front, $4.16⅔ per square foot, and, for the rest of those parcels, $1.95 per square foot, and that for plot No. 4 they adopted the same unit for the 300-foot zone back from the water front, but that, for the interior part of the plot, they treated the matter somewhat differently because of its frontage upon the street, and that as to each plot they added to each such valuation 10 per cent. "for plottage."

The learned counsel for the respondents seems to think, and so claimed before the commissioners, that the commissioners went out of their way to grant such request on the part of the city; but I do not so consider it. In granting such request they were simply doing what this court very likely now would remit the matter to them to do, if they had declined such request. Matter of New York, Westchester & Boston R. Co., 73 Misc. Rep. 219, at 221, 130 N. Y. Supp. 1005.

It does not seem to me, however, of much importance upon what basis of possible subdivision the experts or the commissioners valued, because the several plots had never been actually subdivided in any such fashion, and, with their respective frontages upon Surf avenue, before the taking, evidently constituted large tracts available for amusement purposes; and it would seem, as to each, that its greatest value would be had by taking it as a whole for that purpose.

[4-8] While great regard should here be paid to the conclusion of commissioners who have viewed the premises, yet it seems to me that in such a case as this, where the land is in a well-known locality, long used for a special purpose generally profitable, and having no special features of improvement, it ought to be possible for the evidence to disclose facts, such as actual sales, which would afford a reliable criterion to judge the correctness of those conclusions. I cannot here perceive how any actual view by the commissioners could afford any substantially greater light than the evidence, and especially the maps, which make the situation perfectly plain.

The claimants' experts attempted to sustain their estimates by certain sales apparently known to all the expert witnesses, namely, the Vanderveer sale, the Skinner sale, and the Rauscher sale. Each such sale was of a lot fronting upon Surf avenue and not running through to the ocean. The Vanderveer lot was at the northwest corner of Fifth street and Surf avenue, opposite to the front of the plot out of which parcel No. 4 was taken. It sold, February 4, 1910, for $110,-000. It was 25 feet front on the avenue, 101.29 feet on the street, with an extension to the rear of 38 by 25, which part did not front on the street. It was a hotel property. The experts upon both sides valued the buildings at $50,000, leaving the land at $60,000.

The Skinner sale was of a plot on the south side of Surf avenue, 75 feet on the avenue by 100 feet in depth, apparently being the north-

west corner of the front of the plot out of which parcels 1 and 2 were taken. It sold, January 20, 1908, for $100,000, as claimed by the city's expert, or $110,000 as claimed by the claimant's expert. The buildings upon it were of no substantial value.

The Rauscher sale was in August, 1911, for $200,000, of a plot on the north side of Surf avenue, 75 feet east of West Eighth street, running 134 feet along the avenue by 242 feet deep, but irregular at the rear. It therefore was on the opposite side of the avenue, directly north of the plot out of which parcel No. 2 was taken.

Those three sales, which were the nearest proven of comparatively small lots fronting on Surf avenue and not going through to the ocean, seem to warrant the conclusion that interior lots 20 by 100 deep upon the south side of Surf avenue, in front of parcels 1, 2, and 3, are worth about $25,000 each, and that I understand to be substantially the claim made here by both sides. Thus Day, the leading expert for the city, made that estimate; and Pyle and Porter, of the claimants' experts, made substantially the same; and Mr. Reynolds, president of the Dreamland Corporation, April 11, 1911, testified before the tax commissioners to the same valuation.

The city's experts relied strongly upon two certain sales of large plots going through from Surf avenue to the ocean, viz.: (a) That of the plot out of which parcels 1 and 2 were taken; and (b) that of a plot, also on the south side of Surf avenue, running through to the ocean and situated about 1,000 feet west of parcel No. 1. Those two sales appear to be the only ones in recent years of any large plot of land on the south side of Surf avenue running through to the ocean, anywhere near the locality in question. The first sale was the purchase by the Dreamland Corporation, or its promoters, in September, 1903, of the entire plot out of which parcel 2 was taken. The sale was made by a referee in partition, in two parcels, the first being the frontage of 293 feet on Surf avenue, with a depth of about 450 feet, and the second being of the rest of the plot to the ocean, and being now all included in parcel No. 2. The prices paid were:

For the front part ........................................................... $200,000
For the rear; that is, towards the ocean...........,................... 247,500

Making a total of ........................................,... $447,500

At the time of the sale there were certain improvements upon the land, which are valued in the evidence at $40,000, making the price for the land alone $407,500.

As to the adequacy of that price, it is to be noted that Mr. Reynolds, the president of the Dreamland Corporation, in certain testimony given by him before the tax commissioners, April 11, 1911, stated that he paid "an exorbitant price" for the property.

The following year, March, 1904, the same interest purchased the plot extending from the ocean up to 100 feet south of Surf avenue, out of which parcel No. 1 was taken,

For the price of......................................................... $225,000
The evidence values the improvements at that time on said plot at... 15,000

Leaving, as the price of the naked land...................... $210,000

Therefore the price paid in 1903 and 1904 for the entire plot out of which parcels 1 and 2 were taken was $617,500. Such purchase was evidently made by a ready buyer for the express purpose of establishing the amusement center known as "Dreamland." That purpose was shortly carried out, but the enterprise proved a failure from the start, not having been able to pay any of the interest upon the first mortgage, except for one year, or any taxes.

Much the greater weight of the evidence indicates that there has been no considerable increase in valuation since those purchases. Thus claimants' expert Greve testified that there had been no increase in values since 1904, and Porter, another such witness, testified that there had been none for five years; that is, since 1907. Reynolds, before the tax commissioners in April, 1911, complaining of an assessment of $564,500 for the entire plot out of which parcels 1 and 2 were the next year taken, testified that the assessment of the previous year of $420,000 was full market value.

The award for the land in

| | |
|---|---:|
| Parcels 1 and 2, as it now stands, is............................ | $1,014,602 32 |
| The value of the Surf avenue land in front of parcel No. 2, at the rate of $25,000 for a lot 20 feet front by 100 deep, making 14½ such lots, is.... ................................ | 362,500 00 |
| The value of the second 100 feet back, south of Surf avenue, for the entire north bound of the parcels 1 and 2, 440 feet, at $6,000 for such a lot, which is less than one-fourth of such valuation of the front lots, namely, 22 lots at $6,000, is....... | 132,000 00 |
| Making a total of....................................... | $1,509,102 32 |

In 1903 and 1904, therefore, the entire tract was purchased, as above indicated, for $617,500. It seems, therefore, that the commissioners have valued the land taken in parcels 1 and 2 upon a basis which made the entire tract so purchased worth, in 1912, $1,509,102.32, or 2.44 times its purchase price, and that their increase in valuation over the purchase price was substantially in their such increase as to the portions of the tract included in parcels 1 and 2.

I can see nothing in the evidence to warrant any such conclusion of increase, and I cannot imagine that the commissioners, by their physical observation of the locality, can have seen anything to justify the same. It is evident, moreover, that the commissioners valued parcel No. 3 upon the same basis.

The next sale relied upon by the city's experts is the Ables-Gold Realty Company sale made in 1908 for $325,000 of a plot on the south side of Surf avenue, about 2,000 feet west of parcel No. 1, being 150 feet front on the Avenue, running through south to the ocean about 900 feet. I estimate the distance of 2,000 feet by measuring upon one of the maps, assuming that such map was drawn to a uniform scale.

The street known as the Bowery runs through that plot, parallel with Surf avenue and about 190 feet south of it. Day, leading expert for the city, fixes the value of the plot, according to the purchase price, as follows:

| | |
|---|---:|
| 7½ Surf avenue lots at $14,000. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $105,000 |
| 7½ lots on north side of Bowery,<br>　at $10,000. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 75,000 |
| 7½ lots on south side of Bowery,<br>　at $10,000. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 75,000 |
| 20 interior street lots, 20x150, viz.<br>　on Kensington Walk, at $1,000. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20,000 |
| 7½ ocean lots 20x200, at $5,000. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 37,500 |
| | $312,500 |
| Add 5 per cent. for plottage. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15,625 |
| | $328,125 |

Mr. Somerville, one of the leading experts for the claimants, testified that the Surf avenue lots were worth $20,000 apiece, and the Bowery lots $12,000. The learned counsel for the appellant here claims that the analysis of that sale shows that the tract fronting on the ocean by a depth of 300 feet was sold for about one-quarter of what the commissioners awarded for a like tract upon the ocean front out of parcels 1 and 2; that the allowance made by the commissioners amounts to about $25,000 for a lot 20 feet upon the ocean by 300 feet deep; and that in the Ables-Gold Realty Company sale the ocean front 2,000 feet west brought only about one-quarter as much. It is difficult for me to make a close comparison between that sale and such award. It is clear, I think, in a, general way, that the award is at a much higher rate than the sale, although it seems to be agreed that there had been no advance in value from 1908, the date of such sale, to 1912, the date of the taking.

Various other sales of parcels running from Surf avenue southerly to the ocean were cited by the city's expert as sustaining his conclusions; but all those parcels are situated much more remotely from parcel No. 1 to the west to even a distance of about one mile from it. While his reasoning in that respect seems sound and persuasive, the distance of those parcels is so great from the plots taken herein that I am in doubt as to how much weight should be accorded to such sales.

I am, however, very strongly impressed that the purchase by or for the Dreamland Corporation or its immediate predecessor in 1903 and 1904 of the several tracts out of which parcels 1 and 2 were taken was at the then full value of the land, and that the evidence warrants no conclusion that there was thereafter, up to its taking in 1912, any such increase in value as indicated by these awards. Indeed, I think that the aggregate awards for parcels 1, 2, and 3, of $1,757,627.29, was at least half a million of dollars too great, the price at such purchase of the entire tract out of which parcels Nos. 1 and 2 were taken having been, as above shown, $617,200.

It seems evident that after the fire in May, 1911, which almost totally destroyed the structures upon parcels 1 and 2, Dreamland, so that that corporation collected some $375,000 of insurance, and, in October, 1912, still had $25,000 more of it due, agitation soon began for the taking of these parcels 1, 2, 3, and 4 by the city for a public park. Mr. Reynolds, president of Dreamland, evidently was much

interested in advancing the project. As an inducement to the board of estimate and apportionment to pass the necessary resolutions for the taking, he presented to that board a written option executed by the proper officials of the Dreamland Corporation, to the effect that within sixty days after the final confirmation of the awards to be made for such lands the city might, at its option, purchase said awards for the sum of $1,000,000, with interest thereon from August 1, 1911, such option being tendered and to be received upon the express condition that on or before February 1, 1912, the city should pass such necessary resolutions, the title to the premises to vest on the filing of the oaths of the commissioners of appraisal or within six months thereafter. That board did, on January 11, 1912, receive the option and pass such resolutions, and title vested in the city within the limit of time fixed in the option.

After the evidence had been taken by the commissioners and briefs submitted to them, they, at a meeting held September 14, 1914, expressly directed their clerk to obtain from the comptroller a copy of such option, and at their meeting the next day the counsel for the city, pursuant to such demand, produced and submitted to the commissioners such copy without making any objection or protest.

I note it stated in the brief of one of the claimants' counsel, that the counsel for the city had previously presented to the commission such option; but I find in the record no minute of his having done so, and apparently such claimant's counsel, as authority for his statement, refers to the fact that in this record, as a part of the preliminary proceedings in this matter, the city's counsel had inserted a copy of such option and such resolutions. Such insertion, to my mind, warrants no inference that the same had in any manner been presented to the commissioners upon the hearing.

In January, 1915, the commissioners filed their preliminary report, and the city shortly thereafter filed its objections thereto, one of which was to the effect that the commissioners had erroneously taken into consideration such option, and another was, in general terms, that they had received testimony which should have been excluded. At the hearing by the commissioners upon the objections, they several times complained because the city had not submitted to them certain appraisals, which it was alleged, and apparently at least impliedly admitted by the city's counsel, it had obtained of the property when the board of estimate and apportionment received the option. Indeed the remarks upon that subject, of the commissioner who did the talking, were quite pointed, indicating clearly the commissioner's opinion that the city's representatives had acted quite wrongly in not producing such appraisals or the experts who made them, and were subject to the adverse inference which obtains against the party who has suppressed material evidence at his command.

Indeed, the leading counsel for the claimants took occasion to promptly and strongly enforce the commissioner's views upon that point. That commissioner, however, for himself declared that he had not considered the option, but his fellows appear to have been and remained quite mute upon that subject. Later he pointed out that the

award varied by $34,000 from the amount of the option, which makes a variance of about .034, so slight comparatively, as I think, to suggest to the ordinary mind consideration of the option rather than the reverse. Later still that commissioner quite emphatically reiterated his statement that the award showed no "discrepancy" from the option, whereupon the counsel for the city, forgetting doubtless the commissioner's prior disclaimer, and perhaps not unnaturally, said, "You read the option," and the commissioner, being thereupon reminded, for himself again disclaimed.

While the hearing upon the objections was going on, the counsel for the city stated that he had been informed that the commissioners had consulted an expert who had not been called as a witness in the proceeding, and such counsel asked the name of such expert; but the commission declined to give it, assuming that it had a right to consult in secret an outside expert, and that the city had no right even to know his name. Later the commissioner who talked reiterated his statement, with the caveat that he did not admit that they had consulted an outside expert, but it is to be observed that he did not deny that they had. The counsel for the city seems not to have questioned the right of the commissioners to do that, but to have insisted merely that they should give the name of such outside expert, and receive from him certain written appraisals by two experts whose attendance as witnesses he had failed to procure, which the commissioners refused to do.

After carefully weighing the matter of those proceedings upon such final hearing, I have concluded that the fair inference to be drawn is that the commissioners did consider at least the fact of the taking of the option and its amount. I suppose we are bound to accept as true the declaration of the one commissioner that he did not read it, but his later comment that the award differed $34,000 from the amount of the option appears to me to show that he had such amount well in mind; and I think that the silence of the other two commissioners warrants the deduction that they at least had read and considered the option. Indeed, it is a most remarkable coincidence if the commissioners, by mere chance as it were, came with their final estimates within .034 of the amount of the option. Such a thing no doubt might happen, but it would be at least notable.

I think that the demand for the option, made by the commissioners, was an erroneous proceeding. Even a bona fide offer made to the owner to purchase would be incompetent evidence in his favor. Hine v. M. R. Co., 132 N. Y. 477, 30 N. E. 985, 15 L. R. A. 591. And indeed these commissioners in effect so ruled while taking the testimony, and excluded such proof. I think even that, if the board of estimate and apportionment, apparently having authority to purchase, had made an offer to the owners for this land, which the owners had declined, such offer could not have been proven against the city before the commissioners, although I know of no decision directly upon the point and none is cited in either brief; but certainly the fact of the mere taking by that board of an option is not evidence against the city.

Moreover, I think that the failure of the city to produce, at the commissioners' demand, any appraisals which it might have obtained at the time of the receipt of the option, warranted no adverse inference against the city and should not have been commented upon as it was by the commission. I can conceive of no principle of law or practice which justifies such an inference or proceeding; and yet the leading or at least senior counsel for the respondents even in his brief here comments strongly and at length upon the failure of the city to submit to the commissioners such appraisals, or to call before them the experts who had made such estimates.

Moreover, I think that it was at least a poor exercise of discretion for the commissioners to obtain for themselves the appraisal of an outside expert and to decline to inform the city's counsel of his name. I know that it is said in many decisions that such commissioners are not limited to the evidence, but may obtain information for themselves from outside sources; but I do not think that it is well for them, under that power or right, to go outside and get an appraisal from a real estate expert who is not produced for cross-examination and whose name even is withheld from the parties. I think that the obtaining of information from outside sources should, in the wise exercise of their discretion, have been limited to ascertaining outside already existing facts, such as sales or leases, and should not have extended to the very class of evidence which the parties for three years had, at the hearings, been placing before the commissioners.

It certainly is anomalous, if true, as apparently it is, that these commissioners received an appraisal from an outside expert which they did not disclose to counsel and at the same time refused to receive such appraisals of two other experts when tendered by the city's counsel, but insisted that those experts should be produced for examination and cross-examination under oath. I am sure that the commissioners were correct in declining to receive such two appraisals; but I think that they should not have sought and received themselves, in secret, the appraisal of an outside expert, as apparently they did. But, strange to say, to all this, at least to my mind, improper proceeding, the learned counsel for the city took no objection, save apparently to the refusal of the commissioners to give the name of the outside expert, or to receive from him the appraisals of the two uncalled experts. Still he produced the option only at the express demand of the commissioners, and he may perhaps have felt that it was unseemly for him to object to complying with their express demand, as at an ordinary trial counsel may feel it indelicate to object to a question put by the trial justice himself. If he felt so, I think that he was guided by a mistaken sense of modesty or propriety.

In view of the very large awards made for parcels 1, 2, and 3, and my strong opinion, as above expressed, that they are largely excessive, and of the proceedings as to the option and as to the failure of the city to produce the appraisals said to have been obtained by it with the option, and also of the action of the commissioners in apparently obtaining a secret appraisal from an outside expert, I think that justice requires that this court set aside the report as to those three par-

cels, and remit the matter, as to those parcels, to new commissioners of appraisal, and, therefore, that the second order appealed from, which relates solely to parcels 1 and 2, should be entirely reversed, and that the first order appealed from should be reversed so far as it relates to parcels 1, 2, and 3, and otherwise affirmed, all without costs to either party.

THOMAS and RICH, JJ., concur.   JENKS, P. J., not voting.

CARR, J. (dissenting in part).   I concur to affirm as to parcel 4. I dissent from a reversal as to the other parcels.   The questions involved received very careful consideration at Special Term, as appears from the opinion of Blackmar, J.   I am of opinion that he reached a right result, and therefore I vote to affirm as to all the parcels involved.