## SUPREME COURT — APPELLATE DIVISION — SECOND DEPARTMENT.

November 18, 1916.

## . THE PEOPLE v. EDWARD M. GROUT.

(174 App. Div. 608.)

(1.) PERJURY *—INDICTMENT—CONSIDERATION OF ILLEGAL EVIDENCE BY GRAND JURY, WHERE IMMATERIAL.

A motion. to dismiss an indictment upon the ground that illegal evidence was received by the grand jury. is properly denied if, in addition to the incompetent evidence, there was sufficient competent evidence to warrant the indictment.

(2.) SAME—INDICTMENT BASED ON FALSE REPORT TO SUPERINTENDENT OF BANKS RATHER THAN ON PUBLICATION THEREOF.

Appeal from a judgment convicting the defendant of the crime of perjury in verifying a quarterly report, alleged to be false, of the financial condition of a bank of which the defendant was president, which report was filed with the State Superintendent of Banks as required by section 21 of the Banking Law. It was contended on a motion to dismiss the indictment that it was founded on a copy of the quarterly statement which the defendant, as president of the bank, was required to publish in the State newspaper by section 24 of the Banking Law, which section did not require the published statement to be verified. Indictment examined, and *held*, to be based, not upon the newspaper publication, although the same was referred to therein, but upon the report made to the Superintendent of Banks and required to be verified, so that it was proper to refuse to dismiss the indictment.

(3.) SAME—CRITICISM OF JUDICIARY BY DISTRICT ATTORNEY—CASE ERRONEOUSLY REMITTED TO COUNTY COURT.

The fact that the district attorney, previous to the trial, had criticised certain local judges of the Supreme Court and County Court of Kings county at a public banquet, which criticism applied as much to the justices of one court as to those of the other, did not justify the Special Term in remitting the indictment from the Supreme Court to

See Notes, Vols. 12, p. 256; 16, p. 491; 17, p. 408; 26, p. 273.

the County Court of Kings county for trial, and hence, a new trial being granted upon other grounds, the order remitting the case should be reversed and the subsequent trial be had in the Supreme Court.

(4.) CHANGE OF VENUE.

The Special Term denied the defendant's motion to change the venue which was made upon two grounds: *First*, that there was a great public agitation in Kings county over the failure of defendant's bank resulting in public opinion unfavorable to him; *second*, that great publicity had been given by the local newspapers to the speech and statements made by the district attorney criticising the judiciary, conveying the impression that the defendant had sought and obtained judicial favors, thus creating a popular prejudice against him. *Held*, that while the venue should not have been changed upon the first ground, the second ground warranted a change of venue, but that on the new trial the reason will be insufficient for a change of venue.

RICH, J., dissented upon last point.

PUTNAM and THOMAS, JJ., concurred in result.

(5.) PERJURY—TRIAL—CHARGE OF JUDGE.

It appeared that the defendant's bank had caused to be organized a subsidiary corporation, to which it transferred real estate or mortgages held by it and which it was by law compelled to dispose of, and took back in exchange therefor the notes of the subsidiary company. It also caused the subsidiary company to purchase properties on the foreclosure of mortgages owned by the bank.

*Held*, that it was reversible error for the court to charge in substance that the jury could find the defendant guilty of perjury, in that he did not classify the real estate held by the subsidiary company as real estate belonging to the bank, for if he had listed such real estate as belonging to his bank he would in fact have committed perjury by verifying the report, and this is true, although by organizing the subsidiary company the defendant may have intended to violate provisions of the Banking Law.

(6.) SAME.

*Held, further*, that under the indictment as drawn the defendant could not be found guilty of perjury by reason of the wrongful classification of certain assets consisting of real estate held by subsidiary corporations, especially as, had such holdings been credited to the bank, they would have increased its assets to that extent.

(7.) SAME.

A defendant cannot be found guilty of perjury in verifying statements made " to the best of his knowledge and belief " unless it be established beyond a reasonable doubt that he knew the facts to be false, such being the rule as to perjury in opinion evidence.

(8.) SAME—ERRONEOUS CLASSIFICATION OF ASSETS BY DEFENDANT.

Where the value of real estate actually held by the defendant's bank was attempted to be established by the prosecution only by the testimony of experts and these experts differed among themselves as to the value to an amount which was greater than the amount of the excess wihch the indictment charges the defendant with having reported, it was reversible error and prejudicial to the defendant to allow the jury to find perjury in this respect.

(9.) SAME—REAL ESTATE HELD BY SUBSIDIARY COMPANY.

Moreover, it was error to allow the jury to convict the defendant of perjury because he had not reported real estate held by subsidiary companies and at the same time to find him guilty of perjury in overvaluing the bank's real estate, where in fact it would not have been overvalued had the real estate of the subsidiary companies been taken into account, as the prosecution contends should have been done.

(10.) PRACTICE—REVERSAL ON ACCOUNT OF INCONSISTENT RULINGS.

The court will reverse because of such inconsistent rulings, even though no exceptions thereto were taken.

(11.) PERJURY—FAILURE TO STATE CONTINGENT LIABILITIES.

Where the defendant, in his report to the Superintendent of Banks, answered all questions specifically asked on a blank form furnished by the Banking Department, it was error to allow the jury to convict him of perjury for verifying a report which made no mention of certain contingent liabilities of the bank not yet matured, which information was not requested on the form furnished by the State authorities.

(12.) SAME.

Under the law the defendant was required to answer only such inquiries as were specifically asked by the Banking Department, and it was entirely optional with him as to whether he would insert a statement as to the contingent liabilities, and even if it were a question of doubt as to the duty of the defendant in this respect, perjury could not be predicated upon a matter so doubtful.

(13.) SAME.

The criminal responsibility of the defendant in failing to report the contingent liabilities was a question of law for the court, not one of fact for the jury.

(14.) SAME—PROOF OF SIMILAR ACTS OF DEFENDANT ABOUT THE SAME TIME, NOT ADMISSIBLE.

It was also reversible error for the court to admit proof of a large number of acts of the defendant not specifically charged in the indictment for the purpose of showing "guilty knowledge" or as evidence that the items specified in the indictment were included in the report knowingly and willfully," for, it seems, the crime of perjury cannot

be established by proof that the defendant committed similar acts at or about the same time with a purpose to deceive.

(15.) SAME—GUILTY KNOWLEDGE.

It was error to charge that the jury must find that the report was signed with the " intent " to commit a crime and with an " intent " to deceive the Banking Department or others, for if the defendant verified the report, then knowing it to be false, he was guilty of perjury whatever his motive.

(16.) SAME—QUESTION OF DOUBTFUL EVIDENCE SHOULD BE IN FAVOR OF DEFENDANT.

Where in a criminal action the admission of evidence as to the commission of other crimes by the defendant is a matter of substantial doubt, *it seems*, that it should be solved by the trial judge in the defendant's favor.

(17.) SAME—MISSTATEMENT AS TO MATURITY OF BILLS PAYABLE CONTAINED IN STATE NEWSPAPER.

It was prejudicial error to admit evidence that the copy of the defendant's report published by the bank in the State newspaper, as required by section 24 of the Banking Law, stated that certain bills payable did not mature until December next while in fact upon their face they matured much earlier, although, *it seems*, such evidence may become admissable upon a new trial.

THOMAS, J., dissented as to the admissibility of the evidence of the due date of bills payable inserted in the published copy of the report.

(18.) SAME—WHERE COURT ALLOWS DISTRICT ATTORNEY TO ABUSE RIGHT OF CROSS-EXAMINATION.

Proceedings at trial examined, and *held*, that the court allowed the district attorney to abuse the right of cross-examination of the defendant upon collateral matters for the purpose of impairing his credibility as a witness, but that a reversal should not be predicated upon that ground alone.

*Held*, however, that the errors, collectively, were so numerous and important and prejudicial to the defendant that he was not afforded the fair trial guaranteed by the Constitution, and hence a new trial should be ordered.

APPEAL by the defendant, Edward M. Grout, from a judgment of the County Court of Kings county, rendered on the 27th day of July, 1915, convicting him of the crime of perjury, and from an order denying his motions for a new trial and in arrest of judgment. Defendant also gives notice that an order of the Supreme Court made on May 18, 1914, denying his

motion to dismiss the indictment; an order of said court made on November 12, 1914, denying his motion to set the case down for trial, and remitting the indictment from the Supreme Court to the County Court, etc., and also an order of said court made on March 11, 1915, denying his motion for a change of the place of trial, will be reviewed on the appeal.

*Edward M. Grout,* defendant in person, and *Morgan J. O'Brien,* for the appellant. ·

*Hersey Egginton, Acting District Attorney,* for the respondent.

MILLS, J. :

This is an appeal by the defendant from a judgment·of the Kings County Court, rendered July 27, 1915, convicting him of the crime of perjury in having made certain false material statements in the quarterly report of the Union Bank of the borough of Brooklyn, which was verified by him April 9, 1910. The sentence was of imprisonment in the State's prison at Sing Sing (now Ossining) for an indeterminate term of not less. than one year and not more than two.   Shortly after the sentence the defendant was, by a justice of this court, granted a certificate of reasonable doubt for reasons set forth in his opinion duly filed (91 Misc. Rep. 451) : and defendant was. thereupon admitted to bail and is still at large under such bail.

The following is an outline history of the bank, defendant's connection therewith and of the proceedings in this action :

At and for some time prior to January, 1908, the Mechanics and Traders' Bank was doing a banking business in the boroughs of Manhattan and Brooklyn, having its main office in Manhattan and twelve branches in all.   Its financial condition became impaired and it was closed on January 30, 1908, the State Banking Department then assuming charge of it.   In

the ensuing six months during which it remained closed and in the hands of such department or of a receiver, two examinations of its affairs and condition were made, namely, one in February, by the department (Defendant's Exhibit 63), and one by Cole & Swasey, accountants employed by the directors under authority of a Special Term court order (Defendant's Exhibits 65 and 66). .A plan of reorganization and reopening was formed, approved by the Banking Department and duly authorized by a court order. That plan was consummated and the bank reopened under the name of the Union Bank on August 17, 1908. The leading features of that plan were: (a) The change in name; (b) the reduction of the capital stock from $2,000,000 to $1,000,000; (c) the deferred payments in certain specified installments of a large percentage of the deposits; (d) the discontinuance of the Manhattan offices; and (e) the assumption of the presidency by the defendant. As a basis for such reorganization another examination and appraisal in detail of the assets was made by the department and reported to the court under date of July 18, 1908. That report gave the assets in large detail and showed that with such reduction of capital the bank was solvent and even had a surplus above the capital of $918,821.10, its assets being something over ten millions, and its liabilities, other than capital stock, something over $8,000,000. The defendant had been a stockholder of the former bank and a few days before its such closing became a director and vice-president, but does not appear to have been active in its affairs prior to that time. He participated very actively in the reorganization work, but appears to have become president of the new bank at the solicitation of others, including the superintendent of the department, who in his report to the court insisted that the defendant's presidency should not be " merely temporary." Under defendant's presidency the bank continued to do business until April 5, 1910, a period of nineteen and one-half months, when it was closed and taken pos-

session of by the Banking Department and thereafter went into liquidation. The report which formed the basis of the indictment was made as of March 25, 1910, but was really made and verified by the defendant on April 2, 1910. At the time of such closing the bank had some 12,000 depositors, and there was much agitation in the public press and otherwise over the event. On October 11, 1911, in the Kings County Court, an indictment against the defendant was presented, charging him with the misdemeanor of having violated subdivision 3 of section 665 of the Penal Law by making certain alleged false statements in the said report on April 2, 1910. That indictment was, in December, 1911, by a Kings County Special Term order of this court removed to this court, and on September 19, 1912, by order of such a Special Term, certain allegations were stricken from it; and at such a term held on November 12, 1914, that indictment was, by order made upon the presiding justice's own motion, sent back to the County Court of Kings county. The defendant appealed from that order to this court, which dismissed the appeal, holding that the order was not appealable (166 App. Div. 220). This record does not indicate that anything further has been done with that indictment.

The indictment in this action was presented also in said County Court on December 29, 1913. Upon a contested motion this indictment was removed to this court by order made at such Special Term, January 15, 1914. At a similar term, held March 6, 1914, also upon a contested motion, an order was made granting defendant a copy of the minutes of the evidence taken by the grand jury. Thereafter the defendant made a motion at such a term to dismiss the indictment, and an order was made at such term May 18, 1914, denying that motion. The justice presiding filed an opinion giving the reasons for his decision (85 Misc. Rep. 570). At the same Special Term, and at the same time that the above-recited order was made upon the presiding justice's own motion removing

the first indictment back to the County Court, a like order was made sending this indictment back to that court. The presiding justice, at the time he made such order, pronounced orally an opinion giving his reasons for making it. The defendant attempted to appeal to this court from that order, but the appeal was here dismissed, as was the other one above referred to, as being unauthorized (166 App. Div. 936). Thereafter the defendant moved at the Kings County Special Term of this court for an order changing the venue of this action, but that court, on March 11, 1915, denied the motion, the presiding justice filing an opinion giving his reasons.

The trial began in the County Court on May 24, 1915, and closed with the verdict on July 24th following, having lasted nine weeks. The jury were out from July 22d at 6 P. M., to July 24th at 10:40 P. M., having in the interim returned to the court five separate times for further instructions or the reading of certain testimony as requested by them. The jury accompanied their verdict of guilty with a recommendation to mercy, which was evidently heeded by the learned trial judge.

The record here contains 5,218 pages, and the briefs submitted by the respective learned counsel comprise 1,616 pages, so that the task of their examination has been necessarily great. Moreover, the counsel elaborately and illuminatingly argued orally the main questions involved. It seems proper first to review the three intermediate orders specified in the notice of appeal.

The first such order is that made May 18, 1914, denying defendant's motion to dismiss the indictment. That motion was made upon two grounds, viz.: (a) That the grand jury had received and considered much incompetent and, therefore, illegal evidence in defiance of the command of section 256 of the Code of Criminal Procedure; and (b) that the indictment was based upon the published copy or statement of the quarterly report, which the statute does not require to be verified, so that

defendant's verification of it, if made, could not constitute perjury.

As to the first of those grounds, it is apparent that, if the views hereinafter expressed are correct, much illegal evidence was received by the grand jury, but that there was also before it sufficient competent evidence to warrant the indictment. In general the latter fact is a complete answer to such ground of attack. (People v. Sexton, 187 N. Y. 495, 511, 512, 21 N. Y. Crim. 9.) The notice of such motion was entirely general, viz., to dismiss the indictment as a whole and not a single designated specification therein, as was the motion in the Osborne case (People ex rel. Weeks v. Platt, 173 App. Div. 451), recently decided by this court.

As to the other such ground for the motion, it is my opinion that the indictment was based upon the report made to the Superintendent of Banks and not upon the paper actually published by the bank. I have read with care the opinion of the learned justice in granting the certificate of reasonable doubt, in which he held that the indictment was based upon the latter paper solely (91 Misc. Rep. 451); but I find myself unable to concur with his views and conclusion. In his opinion upon denying the motion to dismiss the indictment, the justice presiding treated this point quite briefly, and perhaps took the view that the indictment could be regarded as based upon both papers. (See 85 Misc. Rep. 576.) If that was his conception of the matter, I do not agree with him, for it seems to me manifest that the indictment was based solely upon the report made to the Superintendent, and that there could be only one such. Section 21 of the Banking Law (Consol. Laws, chap. 2; Laws of 1909, chap. 10) then provided that every such bank should, at least once in every three months, make a written report to the Superintendent of Banks " in such form and containing such matters as he shall prescribe," and, in addition, " the amount of deposits the payment of which, in case of insol-

vency, is preferred by law or otherwise over other deposits," and that every such report " shall be verified by the oath of the president and cashier or treasurer * * * to the effect that the same is true and correct in all respects to the best of his knowledge and belief."

Section 24 of that law provided that within thirty days after the making of such report the Superintendent shall publish a summary statement thereof in the State newspaper published at Albany, and that " the separate report required by said section [21] of each corporation and individual banker shall be published by such corporation or individual banker in at least one newspaper of the place where its principal place of business is located."

It is to be noted that by section 24 the duty of publishing the report was laid directly upon the bank itself, and that the provision called for the publication by it of *the report* and not of a mere abstract or summary thereof, whereas the publication directed to be made by the Superintendent was merely of a specified summary of the report, and that the former publication was to be made in a local newspaper and the latter in the State newspaper at Albany. It appears that in this instance the Superintendent, in accordance with his general practice, sent to this bank printed forms, both for the report and for the paper to be published by the bank, and that those forms were filled out by the bank officials and so used. As I read and construe the statute, the Superintendent had nothing whatever to do with the publication by the bank any more than to discharge his general duty of seeing that such an institution complied with the law. He had no power to authorize the bank to publish anything less than a full copy of the report.

In this case the report actually made to the Superintendent is in evidence as People's Exhibit 22, and the paper published by the bank is also in evidence as People's Exhibit 23, with a photographic copy of each, the former being headed " quarterly

report " and the latter " report of the condition." Each paper appears upon its face to have been verified by the defendant as the president of the bank. As a witness he admitted that he verified the report, viz., Exhibit 22, but denied that he verified the other, namely, Exhibit 23. The testimony of the notary, before whom the verification purports to have been taken, was general, and he admitted no specific recollection of the transaction. The paper published (Exhibit 23) contained in defendant's handwriting the words " not maturing until December next," written in after the printed words or heading " bills payable." Neither those words nor any equivalent ones were contained in Exhibit 22. The indictment alleged: (a) The duty of making and verifying the quarterly report; (b) that the Superintendent designated March 25, 1910, as the date for which said report should be made, and prescribed the form thereof; (c) that on April 2, 1910, defendant and the cashier made, published and transmitted to the Superintendent " a certain written report; " (d) that on April 2, 1910, defendant verified said report; (e) that said report contained various specified statements, some eighteen in all, and that one of them was that the bills payable " did not mature or become due till the month of December, 1910; " (f) that the said statements were false, and that some forty-eight named items specified as included in said statements were false, all to the then knowledge of the defendant; and (g) that the said report was also false to the then knowledge of the defendant in that it failed to include in the liabilities of the bank certain named contingent liabilities aggregating $200,000.

All the foregoing specifications thus contained in the indictment as features of the report therein referred to are true of the report made to the Superintendent and in evidence as said Exhibit 22, excepting the one statement that the bills payable did not mature until December, 1910, whereas the other paper, the one published by the bank, was not presented to the Super-

intendent as a report, but merely as proof of the required publication, and such latter paper did not contain various particulars of the deposits which the report did contain and by the form furnished by the Superintendent was required to contain. The controlling element of identification in the indictment appears to me to be the allegation that the report was the one required to be made to the Superintendent. The mistaken allegation therein that the report contained, among many other statements, the one that the bills payable did not mature until December, 1910, was simply a partial misdescription of the report in that respect and did not serve to vitiate the indictment or make it based upon the paper which was published and which did contain that particular statement. The situation is the same as it would be if the indictment had been based upon the testimony of the defendant given as a witness in a certain trial and had included, among many false statements alleged to have been contained in such testimony, one which was not therein made by the defendant but was made by him in some other testimony or in some other way. It would be, I think, a very forced and unnatural conclusion to hold that such an indictment was not based upon the testimony specifically therein described, but was based upon the testimony not so described.

The same question as to the basis of the indictment was in various ways raised at the trial, and the learned presiding county judge held, as I think, properly, that the indictment was based upon the report made directly to the Superintendent and not upon the paper published by the bank. Accordingly, he refused to submit to the jury as a possible specification of perjury the said statement that the bills payable were not due until December, 1910.

The learned justice who granted the certificate of reasonable doubt, in his opinion, made much of the fact that the report to the Superintendent, viz., Exhibit 22, was not published,

while the paper, Exhibit 23, was, and that the indictment alleges that the report which forms its basis was published. I perceive no difficulty arising from that source. While the paper published was not, as by said section 24 it should have been, an exact copy of the report, yet it cannot be doubted that it was regarded by the Superintendent, in providing the form thereof, and by the bank and the defendant in publishing the same, as a substantial copy of the report. It is to be noted that in the instructions by the Superintendent, which accompanied the form for the report furnished by him, was one that "A copy of this report must be made out on the enclosed sheet and published in a newspaper of general circulation in the town or city  *  *  *  where the bank is located."

I conclude, therefore, that the motion to dismiss the indictment was properly denied.

The second such order recited in the notice of appeal is the one made November 12, 1914, remitting the indictment to the County Court. From the opinion pronounced by the learned justice presiding at that Special Term it appears that the order was made upon his own motion on the authority of People v. De Puy (115 App. Div. 564), and upon the sole ground that the then district attorney had a few evenings before, at a public banquet in the borough of Brooklyn, made a speech in which he had severely criticised the action of certain local justices of this court, and of certain of the judges of the Kings County Court in this action, and in the other above-mentioned criminal action pending against the defendant. Such comments were made entirely out of court, and upon their face applied just as much to such judges of the County Court as to such justices of this court. However ill advised and unwarranted they may have been, they constituted no adequate reason whatever for transferring the case from one court to the other. The transfer of so important a case from one court to another upon so slight a ground should not be permitted to stand as a precedent.

Therefore, if a new trial be ordered, it should be had in the Supreme Court, and the order remitting the case to the County Court should be reversed.

The third and last order recited in the notice of appeal for incidental review is the one made March 11, 1915, at the Kings County Special Term, denying defendant's motion for a change of venue. Such motion was made upon two main grounds, namely, that owing to the great public agitation in Kings county over the failure of the bank, many people in that county, from which the jurors must be taken, had expressed opinions unfavorable to the defendant; and that the great publicity given by all the newspapers of Brooklyn to the said banquet speech and subsequent statements of the district attorney had strongly impressed the people of Brooklyn with the idea, really unwarranted, that the defendant had sought and obtained judicial favors in this very case, and that such impression had greatly prejudiced such people against him, all with the result that he could not obtain a fair trial in that county.

The learned justice presiding at such Special Term denied the motion, as his opinion indicates, because the moving affidavits failed to show in detail the persons who had expressed such views or the opinion that defendant was guilty, and because the newspaper articles attached to the moving papers did not express any opinion as to defendant's guilt or innocence, and because the justice did not think that the said charges against the local justices and judges, made by the district attorney, would prejudice the defendant with a local jury. I quite agree with him as to his first and second grounds or reasons above stated, but find it impossible to agree with him as to the last one. While the circumstances affecting that ground, as disclosed by the papers upon that motion, were such as in my judgment to amply warrant its being granted, still I do not recommend that the order denying the motion should now be reversed and the motion granted. I reach this con-

clusion because it appears from the main record here that upon the trial subsequently had no difficulty was experienced in procuring a jury satisfactory to both parties, and evidently those circumstances were largely of a transitory nature and there seems to be little danger that they will be revived. If, unfortunately, a new trial having been ordered, they should recur, it will be competent for the defendant to renew his motion at Special Term, where it should be considered and determined upon its then present merits, without any possible prejudice from our determination here as to such motion already made and herein reviewed. Therefore, if a new trial is to be had, I think that, in the present situation, it may properly be had in Kings county. In that event no justice who, from his previous association with the defendant professionally or socially, may feel that it would be embarrassing to him to preside at the trial, should hesitate to so declare himself, as three justices of this appellate court have in effect already done; and, if the result should be that all of the justices of the district should ask to be relieved from the trial, it will be an easy matter to secure the assignment of some justice from the upper part of the State who will experience no such embarrassment.

In the conduct of the trial several errors, substantial and to the defendant prejudicial, were committed.

Such an error was the submission to the jury of the alleged wrongful classification by defendant of certain assets of the bank as a sufficient ground to find false a certain material and important statement in the report, and upon such finding to predicate the perjury charged in the indictment. The report contained this statement as an item under the general heading of " resources," viz., "Loans and discounts, $4,954,163.52."

The indictment alleged the said statement, and that the bank did not have loans and discounts to that amount or to more than the sum of $2,955,486.72, making such statement to have been

excessive in the amount of $1,998,676.80, and that the following items, specifying thirty-five which aggregated just the said excess, made up a part of said statement, and were in fact not "loans or discounts or resources of the said bank."

The report also contained the following statement as an item of said "resources," viz., "Stocks and bonds [other than public securities which were of the value of $1,000], $339,434.12."

The indictment alleged the fact of such statement, and that the bank did not have stocks and bonds which were resources of it to that value or to more than the value of $215,464.38, making such statement excessive by the sum of $124,969.74. The indictment also alleged that the following items, specifying two which aggregated such entire excess, were included in that statement but were not in fact resources of said bank. The indictment also alleged, as was the fact, that the report included under said head "resources" a statement that the bank owned real estate amounting in value to $547,187.46, and that said statement was untrue in that such real estate was not then worth over $430,187.46, making such statement excessive by the sum of $117,000; and that "the following items and properties" were included in the said statement at certain stated values and were not worth more than certain other stated respective values, specifying six different real properties, the first so stated values being those carried out in the statement in the report and aggregating the said amount thereof, and the second stated real values aggregating just $117,000 less. The indictment thus specifically alleged forty-three items of resources as having been falsely stated and included in the report. It also alleged five certain other falsely stated items therein upon the liability side thereof, to some of which reference will be made herein later.

At the conclusion of the People's case, upon defendant's motion, the trial judge struck out thirteen of those forty-three items of recourses, all being of the said thirty-five items of

loans and discounts, and also all evidence relating thereto. That left thirty-five specified items of all sorts, thirty-two of which were specifically submitted to the jury as specifications upon which guilt might be found.   The trial judge submitted those in the form of six groups or branches, as he termed them, of which the third consisted of seven of the twenty-two loan and discount items specified in the indictment and not stricken out, viz.:

| | |
|---|---:|
| Ashford Company | $2,769 40 |
| Consolidated Brairwood Estates | 191,547 00 |
| Corporate Realty Association | 13,035 57 |
| Metropolitan Holding Company | 171,542 45 |
| Orr Contracting Company | 20,079 31 |
| Shetland Company | 460,800 00 |
| | $859,773 73 |
| and William R. Pearce | 87,642 55 |
| | $947,416 28 |

The submission was to the effect that the prosecution claimed, (a) not that the several assets referred to in the seven items were not of the value stated, which fact, indeed, the district attorney repeatedly admitted, but that they were really not loans or discounts, but mortgages or real estate of the bank and should have been included in the report as such; and (b) that the said corporations, debtors, were merely " dummy companies, controlled by the bank, the stock and assets of which were owned or controlled by the bank," and that indeed was the claim of the district attorney.   The instruction was that if the jury found that such claim was proven, then they should find that the falsity of the report in that respect was established.   Later the charge instructed the jury that the falsity of any one of the items submitted, if proven, was sufficient to

establish the guilt of the defendant as charged, provided it was also found to be proven that the defendant knew such statement to be false in that respect. The defendant had moved to strike out each of those items from the consideration of the jury, and duly excepted to the denial of his such motions. The counsel for the defendant also, at the conclusion of the charge, requested that the court instruct the jury that it was not incumbent upon the defendant to carry as real estate of the bank the real estate which such a holding company, organized by the bank officials, held, and the court responded: " I will leave it as a question of fact for the jury," the defendant excepting.

The evidence showed that the six several corporation debtors included in the said third group submitted as above stated were corporations which the bank in one way or another controlled. All of them except the Shetland Company had been inherited by the then present bank from its predecessor, through the reorganization. That company had been organized during the defendant's presidency; and, if the theory of the district attorney and trial court be applicable to any of the items, it is perhaps more clearly applicable to the item of the alleged loans of $460,800 to that company. It was incorporated by the defendant, as president of the bank, on March 25, 1909, pursuant to a resolution of its board of directors passed February 9, 1909, and began business in April or May following. That resolution was to the effect that the president should cause the company to be incorporated with a capital stock of $100,000, subscribe for its stock and pay in the amount thereof, transfer to it from time to time real estate or mortgages held by the bank, taking back therefor either the company's notes or certificates of interest or participation or declaration of trust, engage a competent real estate man to manage the same and to do certain other incidental things. (Defendant's Exhibit 93.) The bank paid in the capital, took the stock and, from time to time, made loans

to the company and transferred to it for such consideration certain real estate which the bank had held and had the company buy certain properties in at forecloseure by the bank of certain of its mortgages, and take and hold title to the same. The defendant in his testimony claimed that his sole object in having that company organized and conducted was to relieve the bank and its officers of the management of the real estate, which, principally by the foreclosures, was accumulating in the hands of the bank. Prior to the report in question, that company had been carrying on such business for at least ten months. Since the resolution for its incorporation appeared upon the minutes of the board of directors February 9, 1909, and the payment by the bank of the capital of $100,000 for the stock, or at least one-half thereof, the bank had been examined by the examiner for the Banking Department at least two separate times, viz., August, 1909, and March, 1910, and the minutes of such examinations show that the defendant called the examiner's attention to that company and its purposes, and, further, that no adverse criticism of it was made by the examiner. It was contended by the plaintiff at the trial, and is contended here by respondent's counsel, that defendant's object in having and maintaining such a holding company was simply to make the statement of the bank appear to show that it had much more quick assets, namely, loans and discounts, than slow assets such as mortgages and real estate. There appears to have been no evidence that that was defendant's purpose, e. g., no proof of any declaration by him to that effect, other than the mere fact that such was evidently at least one of the effects of the proceeding. The learned counsel for the respondent undertakes here to justify the submission in respect to these items, constituting the third branch or group of the charge, upon the analogy and doctrine of People ex rel. Hegeman v. Corrigan (195 N. Y. 1, 23 N. Y. Crim. 242), and it is apparent that the learned trial judge considered that case as an authority

requiring him to make such submission. I do not agree with that view of the matter. In that case the relator, Hegeman, was president of an insurance company, which was by statute required to report to the State Superintendent of Insurance its condition on the 31st day of December in each year, such report to be in such form and to contain such matters as the said Superintendent might prescribe, and to be verified by the oath of at least two of the principal officers of the corporation. (195 N. Y. 9.) The form prescribed by the Superintendent in that instance required a statement " of loans secured by pledged stock or other collateral, and furnished an appropriate blank for the purpose," which in the report submitted was answered by the word " None." (195 N. Y. 9.) In fact, at least on December 30th the company had a large amount of such loans, aggregating $1,492,875, and upon that day the relator sent to a firm of brokers a package containing such notes and the collateral thereon, and a letter stating: " For the accompanying package please send us your check for $1,492,875. We will reverse this transaction according to understanding on Tuesday, January 3rd," and the brokers sent back to the relator their check to the company for that amount, and it was forthwith deposited to the credit of the company. On January 3rd the relator sent to the brokers a check for the amount, with a request to " return by bearer the securities delivered to you on the 31st ultimo," which the brokers did; and on the 4th day of January the relator paid to the brokers interest on the money for the few intervening days. (195 N. Y. 4, 5, 11.) Upon those facts the Court of Appeals, Chief Judge CULLEN writing, held that it was competent for the jury upon the trial to find that there never was any transfer of the title of the loans from the insurance company to the brokers. Upon that point the opinion said: " I think that all this did not constitute in law a transfer of the title of the loans to Vermilye & Co., but that the insurance company was still the owner. At least, the jury

might find from the evidence that it was not a real transaction,. but a colorable one only, being merely a device to enable the relator to make the return which he intended to make to the department." (195 N. Y. 11.) Indeed, had the action been a civil one, the court might well have declared, as matter of law, that those facts did not constitute any such transfer of title. In that case the purported transfer was merely in form for four days, including one holiday and one Sunday, and was made with the express understanding upon the part of all that the transfer in form should not stand but should be "reveresd," and the payment of interest for those four days of course served to clinch the matter as to the real nature of the transaction. Here, in the case of this bank and the Shetland Company, the situation was far different and the placing of title in that company was permanent or at least for a long period, and the intent was to have the properties really held and managed by the company. It may be, as claimed by counsel for the respondent, that the formation of the company and its such conduct constituted the violation by the defendant of other provisions of the Banking Law. That question, however, is immaterial here, except as it may affect the defendant's credibility as a witness. The material point here is that as to the Shetland Company loans the defendant made in the report a statement in accord with the real situation of the bank. Had he made such statement otherwise to accord with the theory of the plaintiff's counsel, namely, that the properties held by the company in its name really belonged to the bank, he would very likely have committed perjury in that respect in verifying the report. The position here taken by the respondents' counsel is something like that taken by the plaintiff's counsel in the case of Werner v. Hearst (177 N. Y. 63), wherein he convinced the justice presiding at the Westchester Trial Term that the plaintiff, who had been run over by a wagon delivering certain newspapers, could recover against the defendant personally upon

a finding that the corporations, in whose names the papers were published and distributed and the wagon operated, were not conducted in good faith, and that their articles of association were mere forms under which defendant had and exercised control; and the plaintiff had a verdict upon that theory. The Court of Appeals, however, reversed, holding that " it was not the province of the jury to determine whether they [the corporations] were incorporated in good faith, or whether incorporation was a mere form and an evasive device on the defendant's part to escape an individual responsibility for the conduct of the business." (177 N. Y. 67.) I do not in this record perceive any evidence tending to show that the Shetland Company was not organized as a real corporation.

The same observations and conclusions are in substance true of the other items included in such third group or branch, except that the other corporations were established or acquired under or by the former bank, and that in the case of the individual, Pearce, the titles were taken and held by him individually, he being by the bank furnished with money as loans for the purpose.

Moreover, it seems to me that falsification by such alleged wrongful classification of certain assets was not within the intent of the indictment. If that had been drawn upon the theory that the real estate holdings of the said several corporations really belonged to the bank, the grand jury could not, with any sort of fairness or intelligence, have failed to credit the defendant with the value of those holdings as a part of the real estate values in the assets of the bank. I am unable from the record to make up an exact table of the value of those holdings, but it is evident that their values, with the lowest valuation by plaintiffs' witnesses of the several real estate items specifically alleged in the indictment, would have exceeded one million of dollars, whereas the report gave the value of the real estate of the bank at only $547,187.46. The district attorney repeat-

edly admitted that he did not claim that those loan items were, in making up the report, valued at more than the values of the net assets of the several companies which they represented. Hence those net assets were worth $859,773.73, which is the aggregate of the stated values of said corporation loan items, and most of those assets were real estate. In the view of the matter taken by the district attorney and the trial court, the grand jury could not have charged in the indictment that the real estate value was overstated in the report. We know well that the indictment must have been drawn by the astute and experienced district attorney, and that in doing that work he could not have made such a gross and grievous mistake as that.

I conclude, therefore, that the submission to the jury of the said third group or branch of items was error.

Another error, substantial and to the prejudice of the defendant, was the submission to the jury of the specifications in the indictment of the values of the several real properties held in the name of the bank, as a sufficient basis for finding the statement in the report of the value of the bank's real estate to have been false. I think that the evidence was insufficient to warrant that submission.

The report stated that the value of the bank's real estate was $547,187.46, and the indictment alleged that such value was really not to exceed $430,187.46, and that the several items included in the statement, with their values as thus included and their real values, were as follows, namely:

| Properties. | Stated values. | Real values. |
| --- | --- | --- |
| 808 Broadway | $190,000 | $140,000 |
| 79 Hamilton avenue | 45,000 | 30,000 |
| 2495 Atlantic avenue | 50,000 | 30,000 |
| 1240 Broadway | 180,000 | 160,000 |
| 310 Driggs avenue | 20,000 | 15,000 |
| Corner of Broadway and Hancock street. | 22,000 | 15,000 |

The charge submitted those items as its fourth group or branch of items of resources whose falsity was questioned by the evidence. In that submission the trial judge appears to have submitted plaintiff's case solely upon the testimony of their experts; but there was in fact other evidence for the prosecution upon the subject. Still I think that, taken altogether, the proof was insufficient to establish beyond a reasonable doubt that defendant, at the time he verified the report, knew that the statement as to the real estate valuation was false as being substantially excessive in amount. The learned trial judge in substance instructed the jury that in order to convict the defendant as to any statement in the report, they must, considering the form of defendant's oath, viz., "to the best of his knowledge and belief," find it established beyond a reasonable doubt that he knew the report to be false in that respect. That is the general rule as to perjury in opinion evidence. (People v. Doody, 172 N. Y. 165, 17 N. Y. Crim. 69.)

In the very nature of things, a statement of the value of a parcel of real property must, at least except under very exceptional circumstances, be a matter of opinion; and as thus stated in the charge, in order to convict the defendant of perjury in making under oath such a statement, the evidence must establish beyond a reasonable doubt that when he made it he knew the statement to be false.

The People attempted to prove the falsity of said statement in the report of the valuation of the real estate by the testimony of certain real estate experts who themselves varied substantially in their estimates. Thus as to the value of the Seventeenth Ward or Greenport Branch property, those experts varied from $70,000 to $100,000. This difference of thirty per cent was greater even than the excess alleged in the indictment as to some of the properties; so that, upon the theory of plaintiff's counsel, the testimony of one of those experts might well be used to indict and convict the other of perjury. Indeed such

testimony must have been much lower even than that upon which the grand jury in the indictment found the real value, as the latter was $430,187.46, and such testimony was $240,-437.46, as summarized in the brief of respondent's counsel. The wide difference and uncertainty of such estimates is well illustrated by the frank statement of one of plaintiff's such experts, in which, when asked for his opinion, he replied: "That would be a very hard thing to state. * * * Every man would have his opinion as to value, and mine would be simply an opinion." And again: "Expert opinion in the real estate field varies very much as between entirely honest experts." The plaintiff's experts estimated the several real properties of the bank to have been worth in the aggregate $240,437.46, as against $547,187.16 given in the report. In other words, their estimate was about forty-five per cent of that given in the statement. Any one who has had much experience with the variance of the sworn estimates of real estate experts will at once recognize that that difference is nothing striking. In the Coney Island Park case (Matter of City of New York, 171 App. Div. 834), in which I recently wrote the opinion adopted by the majority of this court, it appeared that as to one of the plots condemned the lowest estimate by the claimant's experts was about three times the highest by the city's experts (p. 840); and the greatest difference between such estimates of the opposing witnesses was considerably larger. It seems to me a very forced thing to ask the conviction of even a professional real estate expert witness upon the testimony of other like experts showing a valuation of about fifty per cent less. If such a precedent were to be established, I fear that our grand juries would be overburdened with efforts by disappointed litigants to obtain such indictments. The differences alleged in the indictment were even much less than that indicated by the plaintiff's expert testimony.

There was, however, as above stated, other evidence for the

People upon the subject. Such other evidence in the main consisted of certain talks between the defendant and one Corwith, a director in one of the branches of the bank. He testified at first, under somewhat leading and suggestive questions, that upon several, at least three, occasions, beginning about the time this bank opened, he told the defendant that he thought the Greenport Branch property was carried upon the books of the bank at too high a figure, viz., $150,000, and that he did not think that it was worth more than $100,000, and that defendant said that the bank had received from the Banking Department such valuation with the value of the other real properties, but that defendant agreed with him that when the time was opportune such value would be reduced by the bank officials. It later appeared that he only inferred that defendant agreed with him, and that in fact the defendant did say that they were carrying the properties at the values which had been given them by the Banking Department. Upon his cross-examination it appeared that every six months, as a member of the committee of the bank's directors, to investigate and report to the board upon the condition of the bank, the witness had under oath himself reported only the very values of said real properties as stated by the defendant in the report here in question. It would seem that under those circumstances very little weight could reasonably be given to his testimony. At the best, however, that merely showed that he expressed to the defendant his opinion that one of the banking house properties was upon the books of the bank being valued one-third too high, and that as against such opinion the defendant had the valuation turned over to him by the Banking Department, but was at the time considering reducing such valuation. This, also, seems to me a very slight and insufficient basis upon which to predicate perjury against the defendant.

Upon this subject the plaintiff had also another item of proof, namely, a pencil memorandum (Plaintiff's Exhibit 935). That

paper was produced by plaintiff's trial counsel upon the cross-examination of defendant, and shown to him.    He claimed to have no recollection of every having seen it, although he admitted that certain figures and letters upon it, viz., " O. K." and " M," looked something like the letters which he makes; but he was positive that none of the writing was in his hand. Upon his redirect examination, after having been furnishtd with a photographic copy of the paper, he declared positively that he had no recollection of ever having seen it before it was exhibited to him upon the cross-examination, but admitted that on April 4, 1910, when the bank closed, that being two days after his verification of the report, he did some figuring with the cashier, in whose writing most of the paper was, as to the assets of the bank, but that the " O. K." and the " M " on the paper then, upon careful examination, did not look to him like his own. No proof was given showing how the district attorney came into possession of the paper, or its history, or directly showing that it was ever in the defendant's possession; but there was testimony of certain experts that they believed that at least the " O. K." and the " M " and some of the figures upon the paper were in the defendant's hand; and the district attorney claimed that the jury should come to the same conclusion from their own comparison with defendant's admitted writings and figures in evidence.    No claim was then, or is now, made that any word in the paper was written by the defendant.    It is manifestly a difficult matter to identify handwriting by merely three separate capital letters and by figures, but, assuming that the jury were warranted in finding, as claimed by the district attorney, that the figures and the said letters in the fourth and fifth columns of the paper were made by defendant, I think that the paper was of very little probative force.    A photograph of it appears in the record and bears the date of March 23, 1909.    The paper consists of five columns, the first headed " increased " and giving an amount for each real estate holding

of the bank; the second contains a brief designation of each such holding; the third is headed " carried at " and gives the figures at which such holdings were valued in the books of the bank; the fourth gives blanks in two or the lines, that is, opposite two of the properties, the letters " O. K." opposite one and certain figures opposite the others, lower than the respective " carried at " figures; and the fifth column contains figures in the respective lines, which are totaled as " 180 M," meaning, doubtless, $180,000, which is the footing of the first column headed " increased." Taken most strongly against the defendant, the paper shows that on March 23, 1909, defendant was considering reducing the book values by the respective amounts stated in the fifth column, and that he had had in some way information that at some time, which must have been before the reorganization, the book values had been increased respectively as set forth in the first column. I fail to perceive how that showed that he had been convinced that those increases were originally unwarranted or had by subsequent events become unwarranted. The theory of plaintiff's counsel seems to be that if any one told the defendant that he thought the book values were too high, it was then the defendant's bounden duty to accept such information as correct, notwithstanding the facts that he had received such values from the Banking Department less than two years before, after supposed careful appraisals made by its experts and examiners, and that there was no evidence to show any general depreciation in values of real estate in the respective localities. I cannot agree with this view, at least not to the extent of imputing perjury thereon. It is to be noted that there was no evidence that such increases in book value had ever been made by this or by the predecessor bank. The books of both institutions must have been available to the district attorney, and, if such increases had in fact been made, he could readily have proven it by those books or even by the several quarterly reports to the Banking Department.

I perceive in the record no other substantial evidence in favor of the plaintiff upon this question. The values included in the statement in the report were those which the Banking Department had given at the reorganization, and which had been upon the books of the bank throughout defendant's presidency and had been approved or at least permitted by the examinations by the State Bank Examiners and had been returned by the several sworn reports of the examining committee of the board of directors at three different times at the several six months' periods. It seems to me entirely unwarranted, and indeed a most dangerous precedent, to convict the defendant of perjury for having put those values in the report, although very likely they were substantially too great.

Moreover, as hereinbefore stated, if the third group of items was properly submitted to the jury as false because wrongly classified, it is plain that the real estate valuation was in the report far understated and not at all excessive. It is incomprehensible to me how this view of the matter can have escaped the appreciation of the learned and experienced district attorney and trial judge. It appears to me to be manifest even to a demonstration. The unfairness of the trial is perhaps better or more strikingly exhibited by this feature of the case than by any other. The submission of both such third group, namely, that of the alleged wrong classification, and of the fourth group, namely, that of the real estate valuation, was independent of one another. It was not in the alternative, namely: " If you fail to find the alleged false classification established, then you may consider and pass upon the question of the alleged false valuation of the real estate." It may well be that the jury convicted the defendant upon both the third and fourth groups, which would constitute an utterly unwarranted and indeed an absurd situation.

In conclude, therefore, that it was error to submit to the jury such fourth group of items, and that defendant's motion to

strike out such items should have been granted.  I do not find that the learned counsel for the defendant excepted to the submission of either of the groups herein considered.  He evidently relied upon his motion to dismiss or strike out the various items comprising them, and upon his exception to the denial of each such motion, as no doubt he was entitled to do.  However, even if no exception had been taken to such important rulings or proceedings, it would be our duty here to consider and review them.

Another grave error in the conduct of the trial was the submission to the jury of the fact that the report did not state any contingent liability of the bank, when in truth it had two such.  That matter was submitted as the sixth branch or group of the items specified in the indictment and not dismissed or stricken out by the trial court.

As hereinbefore stated, the report was made out upon a printed form given to the bank by the State Superintendent of Banks, and had, as to the contents and character of the report, his directions by certain headings upon the different lines and by certain instructions upon the back of the paper.  In the form furnished for the report in question and upon which it was made there was upon the liability side of it the heading " bills payable," and upon the next line below the heading " other liabilities, viz.," and following and below that, upon separate successive lines, these headings: (1) " certified checks," (2) " cashier's checks outstanding," (3) " bills re-discounted," (4) " unpaid dividends," (5) " reserved for taxes," (6) " accrued interest entered on books at date of this report," and (7) " accrued interest not entered on books at date of this report; " and then, below the last such line, there was about one-half inch of blank space and below that the cross or horizontal lines for the summing up of the total.  In the instructions upon the back of the form there was the following: " If you wish to report items to which the printed heads will not apply, write

them in on the blank lines." In the report made the defendant answered the inquiry in each of the said subsidiary lines, but put nothing whatever in the half-inch blank space. It is undisputed that at the time the bank was contingently liable in the sum of $200,000 upon two obligations of other corporations to other parties, which it had guaranteed, one being for $75,000 and the other for $125,000, but that upon neither had any liability at that time actually matured, each being secured also by certain collateral, which was liable before its guaranty, or to which it, in aid of its guaranty, would be entitled to be subrogated. There appears in the evidence to have been no dispute about the facts affecting this matter, except as to the real value of such collateral, and as that does not affect the question of submission, I do not attempt to review the evidence any more at length. The indictment alleged that the Superintendent did require the bank, in said report, to state all its liabilities; that the report did state that the liabilities therein given were its only ones, but that, in addiion to the liabilities therein stated, the bank had also the said two contingent liabilities, naming them, as the loan by the Onslow-Moore Company for $75,000 from the Metropolitan Trust Company, to become due on June 17, 1910, and the loan by the Shetland Company from the said trust company for $125,000, to become due on the same date, the report having been made on April 2 as of March 25, 1910.

The Banking Law (section 21) provided that such quarterly report of a bank should contain a statement of the amount of preferred deposits, and otherwise shall be " in such form and containing such matters as he (the said Superintendent) shall prescribe," and the Superintendent here performed such duty of prescribing by furnishing such blank form. It seems to me entirely clear that the defendant, under that law, was required to have in the report only answers to such inquiries as were therein specifically made, and that it was entirely optional with

him whether or not he would insert anything else in the half inch blank space where the learned counsel for the plaintiff claimed he should have written in said contingent liabilities. The very language of the instruction above quoted from the back of the form, viz., " If you wish to report items to which the printed heads will not apply, write them in on the blank lines," clearly stated a voluntary option, not an imperative duty. It is not questioned by plaintiff's counsel that the said printed subsidiary lines did not call for a statement of such contingent liabilities, and of course the general heading, " Other liabilities, viz.," was merged in the subsidiary ones named below it. At the most it was a doubtful matter whether or not the form required a statement of such contingent liabilities, and no perjury should be predicated upon a matter so doubtful. It is evident that the learned trial judge was himself in doubt upon the subject, as he attempted to put over upon the jury what was clearly his own duty and province, namely, to determine whether or not the law and the requirements of the Superintendent in evidence required the defendant to report such contingent liabilities, namely: " I decline to charge that, and leave it as a question of fact for the jury." It would be interesting to know upon what test the trial court supposed the jury were to determine that question. I do not perceive that he gave them any test or standard for the work. Perhaps he intended that they should apply the test that, in order to carry out the manifest purpose or scheme of the Banking Law in that regard, it was the duty of the Superintendent, by some appropriate general or specific inquiry, to call for a statement in the report of those liabilities. This trial, however, concerned the failings of the defendant, not those of the Superintendent, and the defendant should not have been held answerable for the latter. The question so submitted to the jury was plainly one of law, which the trial judge should have decided, or as to which he should have

17

advised the jury. I understand the learned counsel for the respondent in effect to agree in this view, but to contend that no harm was done the defendant, as the judge should have advised the jury that it was the legal duty of the defendant to report such contingent liabilities. I think that was not the defendant's duty, and that he was warranted in so concluding, and that the trial judge erred in submitting the said sixth group or branch of items to the jury and in refusing defendant's request to charge that it was not his legal duty to include those in the report, and also his request to have those items withdrawn from the consideration of the jury. Defendant's counsel had also, at the conclusion of plaintiff's case, moved to strike those items out, and had excepted to the denial of his such motion. In the Federal case cited by the counsel for respondent (Cochran and Sayre v. United States, 157 U. S. 286, 39 L. Ed. 704–708) the form under the heading "liabilities other than those above stated" called for a comprehensive and complete statement, and, therefore, for a statement of the contingent liabilities, and hence the answer, "none" written in, there being such liabilities, was false. That case was the same as this case would have been if the said half inch blank space had been headed with the words "liabilities other than those above stated," instead of having no heading at all.

Another serious question of error is presented by the receipt in evidence of a large number of other items and other acts of the defendant than those specifically charged in the indictment, and the submission of those to the jury as evidence of " guilty knowledge," or, as more fully later stated in the charge, as evidence that the items specified in the indictment were included in the report "knowingly and willfully." Just what the learned trial judge meant by those limitations it is difficult to understand, as there was not the least question in the case but that defendant, when he verified the report, knew what it contained

and intended that it should contain what it did. It would seem from the discussion between the court and counsel when the question of the admissibility of such other items and acts was first raised and passed upon at the trial, that by the term "guilty knowledge" the trial court meant knowledge of the falsity of the statements in the report.

Three days before the trial began the district attorney served upon defendant's counsel a written notice to the effect that at the trial the plaintiff would offer evidence of eighty-five items specified in the notice, in addition to those specified in the indictment as having been included in the totals, given in the report, of figures in excess of the true values. The counsel for the plaintiff contended then, as respondent's counsel do now, that it was sufficient for the indictment to charge the falsity of any statement in the report, even of any total, and that at the trial it was competent for the plaintiff to introduce in evidence any item of the assets or liabilities intrinsically included in such statement to establish such falsity. This view the trial court refused to adopt, and, therefore, declined to receive such proof of such added items to establish the allegations of the indictment as to falsity, but admitted the evidence solely to show "guilty knowledge" of the falsity of the items specifically charged in the indictment, or some of them. In that view and decision, that such proof could not be received to establish the falsification alleged in the indictment, I agree. According to the contention of respondent's counsel, it would have been enough for the indictment to allege the falsity of the most general and final summary contained in the report, namely, the amount of the surplus, and then at the trial to sustain that allegation by proof that any subordinate detailed statement of the report was false. I do not think that that view is correct. It seems to me that the command of subdivison 2 of setcion 275 of the Code of Criminal Procedure, that the indictment shall contain " A plain and concise statement of the act con-

stituting the crime, without unnecessary repetition," required as to this indictment that it should lay its hand upon the detailed statement in the report which it claimed to have been false. This, however, is a mere moot question upon this appeal, because the grand jury chose to give in the indictment the specifications of falsity, and the evidence at the trial had to be held to those. The incongruity of the situation before the jury as to such eighty-five items, as the same were submitted, is manifest. The jury was in effect instructed that they were bound to consider the report as truthful, so far as it was made up of those items as constituent elements of the totals given therein, but that they were at liberty to find them false as evidence of defendant's guilty knowledge of the falsity of other such constituent element items which were in the indictment specifically charged to have been falsely stated and included in such totals. Thus the jury were permitted to treat the same items in the same case as both false and true upon a refinement of metaphysics exceedingly difficult to appreciate or apply.

The counsel for the respondent here attempts to justify the receipt of such evidence and the such submission thereof upon the authority of People v. Katz (209 N. Y. 311); and the trial court evidently regarded that case as being such authority. The opinion in that case clearly and succinctly stated the general rule which upon the trial of a criminal action confines the plaintiff's evidence to proof of the commission of the identical criminal acts charged in the indictment. Upon that point the opinion said: " There are various recognized exceptions to this rule, however, and one of them is that when guilty knowledge, quite commonly called intent, is an essential ingredient of the crime charged, evidence is admissible of similar crimes or acts committed or attempted at or about the same time by the person charged. The reasons for the rule and the exception are equally simple and obvious. * * * Familiar il-

lustrations of this exception to the general rule are to be found in cases of uttering counterfeit money, in forgery, in obtaining money under false pretenses, and in receiving stolen property." (209 N. Y. 327, 328.)

It is to be noted that perjury was not included in that enumeration. The test for the application of the exceptional rule, therefore, is: "Was intent an essential ingredient of the crime charged," or, in other words, can guilt be predicated "upon the mere commission of the acts charged as a crime?" This question appears to have been answered by the same court in People ex rel. Hegeman v. Corrigan (*supra*, 195 N. Y. 13). Upon that point the opinion there said: "Therefore, if a person willfully testifies to what he knows to be false, this is the criminal intent and the only criminal intent that can exist in the crime. That the ultimate object to be attained by the perjury may be beneficent or indifferent in no way absolves or qualifies the criminality of the act."

The trial court here, even at the request of defendant's counsel, charged that in order to convict the defendant the jury must find that the said quarterly report "signed by him on the 2d day of April, 1910, was signed with the intent to commit a crime, with a felonious intent, and with intent to deceive the Banking Department or others to which the report was to be remitted," and in so charging the trial judge was clearly mistaken. He had in the main charge correctly defined the requisite intent in substantial accord with the rule of the Hegeman Case (*supra*). By that rule, if defendant, when in the report he made a given material statement, then knew it to be false, he was guilty of perjury when he verified the report, whatever his motive in so doing was. As I understand the rule, under such circumstances proof of the commission by the defendant of other like acts at or about the same time, having the like purpose to deceive, is not competent. No precedent to the contrary in any perjury case is cited in the briefs. The case of People v. Doody

(172 N. Y. 165) does not appear to me to be such a precedent. The defendant there was charged with perjury in having, at the second trial of a certain case, testified that he did not then remember certain material facts to which he had testified at the former trial only a few months before.   It became material, therefore, for the plaintiffs to show that he did have those facts well in mind, and to that end they were permitted to prove his many prior statements of those facts, and such procedure was upheld by the Court of Appeals.   Upon that point the opinion said: " This testimony was not offered or admitted for the purpose of proving other offenses, but for the purpose of establishing the fact that he remembered and knew certain things which he swore that he did not remember or know." (172 N. Y. 174.)   This excerpt seems to me to imply the view that the exceptional rule stated in the Katz Case (*supra*) was not applicable.   Had it been, that alone would have justified the evidence, and it cannot be supposed that so learned and experienced a jurist as the late Judge O'BRIEN, who wrote for the court in the Doody case, would not have assigned that ground if in his judgment it existed.   It is to be noted that some of the acts proven here under this head were merly violations of other provisions of the Banking Law, having no part or tendency towards proving any design on the defendant's part to misrepresent the condition of the bank, but simply, at the most, a design to act as he pleased in disregard of the restraints of that law and thereby to keep the bank going at all hazards.   Such acts were the making of loans when the reserve was not fully up to the statutory standard, and the Minuth matter, as to which, although brought out on defendant's cross-examination, the plaintiff was permitted to introduce affirmative documentary evidence.   If the indictment had charged defendant with having committed a certain perjury in testifying as a witness in his own behalf in the trial of a certain lawsuit, it seems to me that it would not have been com-

petent for the People, at the trial upon the indictment, to prove that he had committed other unlawful acts, such as attempting to bribe a juror or to suborn a witness or to hire an adverse witness to leave the jurisdiction, all in aid of his paramount purpose to win his case.

It is suggested by counsel for the respondent that information as to many of such items and facts could have been forced from the defendant upon his cross-examination, to discredit him as a witness. No doubt at least some of them could, but then they could not have been submitted to the jury as evidence to any other effect than as impairing his such credibility, and the plaintiff could not have directly contradicted any of defendant's statements as to the same or added any proof in regard to the matters involved therein.

In the view most favorable to the plaintiff of this class of evidence, its competency was doubtful, and at the trial of a criminal action a question of substantial doubt, even as to the competency of proof, should and wisely may be solved by the trial judge in defendant's favor. The probable great harm done to the defendant by the admission of this class of proof is perfectly manifest. A few instances will serve to enforce this observation.

The failure to maintain the reserve up to the statutory standard was such a matter. Section 67 of the Banking Law (as amd. by Laws of 1909, chap. 223) required such a bank to maintain a reserve in cash or upon deposit with other banks and trust companies of not less than twenty per cent. of its aggregate deposits, exclusive of deposits which are secured by outstanding unmatured bonds issued by the State of New York, and that when the reserve is below that standard no new loans shall be made by the bank. The evidence showed that in estimating such reserve this bank included certain certificates of deposit with a trust company, which deposits that company held as security for loans, and that with those certificates excluded the

reserve of this bank was below such standard for a long time, and with them included was below that for some considerable time, although at times only a fraction of one per cent. below. The plaintiff's counsel summed up at length and with great force against the defendant upon those facts. That part of his summation occupies four pages of the record. Its prejudicial effect is manifest.

The Thomas matter is another such instance. There appears to be no substantial dispute about the facts— that is, as to what was really done by the bank in that matter, or, as I think, that defendant knew what was being done. At the closing of the former bank, Thomas owed it some $600,000, and upon the reorganization and opening of this bank there was, by the direction of the Banking Department, upon that asset charged off to profit and loss the sum of $247,549.16. In April, 1909, this bank and several other like institutions having liabilities of Thomas, entered into an agreement by which, in effect, they pooled their several such interests and the collateral which they respectively held thereon, and whereby Thomas agreed that a certain sum annually should be paid to his such creditors out of his income under a trust in his father's will. The defendant in his testimony claimed that upon the accomplishment of that trust agreement be became convinced that the original Thomas asset had been marked down far too much, and that with the agreement it was worth much more, and that to represent such increase in value he had credited to profit and loss, on April 14, 1909, $125,000, and on October 26, 1909, the further sum of $100,000 under the heading " recovery or appreciation Thomas liquidation account," and not with any entry or pretense that any sum of money had actually been received. Those credits were in fact so made and about the same time several additional charges off upon or of other assets were made by the direction of the Banking Department, viz., from March 22 to April 14, 1909, the sum of $129,974.77, and from October

5 to 26, 1909, the sum of $175,799.54. The counsel for the plaintiff claimed that those credits were made by defendant simply for the purpose of largely offsetting the said charges off so as to represent the bank's condition as better than it really was. He summed up powerfully to this effect. The record is a practical demonstration that this matter greatly prejudiced the defendant with the jury. They retired at 6 P. M., July 22d, and at 9:45 A. M., July 24th, came into court and asked to have read to them the cross-examination of the defendant as to the Thomas item, and it was then read to them, and also the evidence, showing such entries, all at full length. They then retired, and remained out until at 10:40 P. M. they delivered their verdict of guilty. The indications, therefore, are very strong that that collateral matter, which did not involve any perjury, and which at the time of its occurrence had in a letter been explained by defendant to the Banking Department, and does not appear to have been unfavorably criticised by it, but rather the reverse, really produced the final agreement of the jury. It is manifest that if the jury took the view of plaintiff's counsel of that transaction, its effect to convince them of the purpose of the defendant to keep the bank going at all hazards, and to that end to exaggerate favorably its condition, was very strong. In a recent case the Court of Appeals gave great weight to like conduct of the jury. (People v. Swersky, 216 N. Y. 471, 480.)

The third instance of the probably great prejudicial effect of the proof of another such collateral matter is the statement in the published paper that the bills payable did not mature until December next. The facts as to that have been hereinbefore quite fully stated. Although the trial court held that that paper was not a part of the report, and, therefore, that such statement could not be treated as a specification of the perjury charged, he nevertheless admitted evidence of the falsity of the statement and submitted the same to the jury

as proof of such "guilty knowledge." It may be noted that in finally ruling upon the admissibility of this matter, the trial judge said: "Any false statement will go to the question of his guilty knowledge as to the items specified in the indictment." Those items did not contain anything directly or indirectly upon the point, namely, the time of the maturity of the bills payable, which was covered by this statement in the paper published. Much evidence upon the subject of the falsity or truth of such statement was introduced upon each side. The plaintiff's counsel contended that such statement was entirely untrue and was made by defendant for the purpose of materially deceiving the public as to the condition of the bank. In fact the notes showing such liabilities did, upon their face, appear to mature much earlier than December. Such counsel summed up against the defendant very vigorously upon this point. The defendant, in his own behalf, testified that he had been advised and in good faith believed that, although those notes upon their face appeared to mature before that December, yet the payees thereon had agreed to renew them until that time if the bank so desired, and there was other evidence tending to substantially corroborate him in that regard. No doubt, if any of the items of this class could properly be proven for the purpose for which they were admitted, namely, to establish guilty intent, such statement that the bills payable would not mature until next December could be so proven, as, if the jury were convinced that the statement was designedly false, they might well find that it was made with the same intent to deceive the general public with which the plaintiff's counsel claimed the alleged false statements specified in the indictment were made in the report, that is, to deceive the Superintendent and through him the general public. The jury were not likely to distinguish closely between deceiving the public through a direct statement to it and through the report made to the Superintendent. What, however, is here sought to be

presented is the great prejudicial effect of this evidence and of the arguments which, if the evidence were competent, it justified, and that effect seems manifest.

It is impossible within the compass of any practical opinion to review each of the eighty to ninety items of this class of evidence and submission. It may be that some of them will appear at a new trial to have some legitimate tendency to show defendant's knowledge of the falsity of some specification included in the indictment, and if so such will be competent proof. For instance, if the report had contained a statement that the bills payable matured the coming December, and the published paper had said that they matured in June, six months earlier, and such was the fact, no doubt that paper would have been competent evidence to establish defendant's then knowledge of the truth of the matter.

Moreover, many of those items may be competent evidence in proving that the items specified in the indictment were in fact included at their face values in the statements in the report, as is alleged in the indictment, but that did not make and cannot make competent evidence that those values were excessive or then known to the defendant to be excessive.

In addition to the foregoing discussed errors, which were both technical and substantial, I think that the trial court suffered the plaintiff's counsel to exercise, at least to the very limit of propriety, the right of cross-examining the defendant upon collateral matters to impair his credibility as a witness. There is perhaps no other right of counsel in the conduct of a trial, which is more frequently abused than that. The trial judge, in the wise exercise of his discretion, should even of his own motion limit such inquiries to matters which by common understanding have a clear tendency to show moral turpitude upon the part of the defendant. Thus this court, some few years ago, held that such cross-examination, even in a civil case, should not be extended so far as to show that the defend-

ant witness had been fined for violating an automobile speed
ordinance.    (See v. Wormser, 129 App. Div. 596.)

The learned trial court permitted plaintiff's trial counsel here
to examine defendant closely as to several of his collateral acts
in relation to the bank, which appear, at least to me, to involve
no moral taint whatever, but which, as presented by such coun-
sel in his summing up, were made to bear heavily against the
defendant, by at least impressing the jury that he was penuri-
ous and self-seeking.

Such an act was his conduct in the Minuth matter.    While
president of the bank the defendant continued, as far as possi-
ble, his practice as a lawyer, and, therefore, his connection
with his law firm.    That firm had pending a civil action for a
Mrs. Minuth, to recover damages, I infer, for personal injuries.
She needed money and by defendant's procurement borrowed
one thousand five hundred dollars from the bank, giving for
the loan her note with the written guaranty by defendant of
its payment.    The note became due July 15, 1909, but was not
then paid.    Defendant sent the note to his firm with directions
to sue upon it, and the firm brought suit upon it in the name
of the bank, against Mrs. Minuth.    That action resulted in
her assigning, March 29, 1910, a part of the judgment which
she then had recovered in her action, and so the firm collected
the money upon the note subsequently to the suspension of
the bank and held it on account of a much larger sum due to
the firm from the bank for other services.    It appeared upon
the cross-examination that in the outstanding bill of the firm
against the bank there was a charge of fifty dollars for ser-
vices in such action upon the note, and of eleven dollars and
thirty-five cents for disbursements therein, but defendant de-
nied any knowledge or information that the bill contained
any such charge and disclaimed any intent that it should.
The summation by plaintiff's counsel upon the matter was most
drastic.    The counsel for the respondent, in their brief at

page 83, go so far as to say in reference to it, " That before the trial was concluded any lingering respect for his (defendant's) reliability as a witness was dissipated, plainly appears from the facts in connection with the Minuth matter." For my part, I can see nothing in that matter justifying any adverse criticism whatever, and certainly nothing imputing moral baseness to the defendant. The situation in it is obvious. While defendant was bound upon his guaranty of payment to pay the note at once when the maker did not, that procedure would lead him to sue his client directly. Doubtless he had a lawyer's natural repugnance to bringing an action against his client, and preferred that the action should be brought in the name of the bank; and yet we are here gravely told that the proof of that transaction elicited from the defendant, upon his cross-examination, dissipated with the jury any respect for his reliability as a witness, which might have still lingered with them. That effect, if really thus produced, was in my judgment utterly unwarranted.

Another instance of excessive cross-examination appears in the matter of defendant's own note to the bank. His cross-examination revealed that the bank held his note for $800, with interest, given in February, 1909, and that the note was not paid by defendant until after the bank closed. After that day, and before the note was finally paid, defendant wrote a letter to the Deputy Superintendent in charge of the liquidation of the bank, claiming certain offsets to the note, and that letter, with the accompanying proof of such claim, was received in evidence, over defendant's objection, as affecting his credibility. It is elementary that for such purpose it was incompetent for the plaintiff to introduce such evidence, other than by the cross-examination of the defendant. Plaintiff's counsel in his summing up did not fail to comment upon this matter as one of " the things that count." It seems most extreme to urge such a thing as of weight upon the trial of

one for the serious crime of perjury. There was no doubt upon the evidence that the defendant was entirely good for many times the amount of the note, and the thing was, at the most, of very trivial importance, as compared with the weighty matters really involved in the case.

Another matter of very little import as reflecting upon defendant's character was elicited by the cross-examination, and that was that some time in 1909, when a few shares of the stock of the bank had been sold in a few small lots below par and much below their book value at one of the auction rooms in New York City, the defendant formed a pool with some other directors and people interested in the bank, he putting in $500, to purchase any other small lots of the stock that might otherwise be sold low, and the pool did purchase about 125 shares. The defendant and his wife at the time owned some 250 shares of the stock, and the bank held a considerable number of such shares, which it had been compelled to take in for debt and which, by the terms of the Banking Law, it was bound to sell shortly and was of course desirous of selling at a good price. In his summation plaintiff's counsel made much of the pool transaction. I fail to appreciate how that warranted any reflection upon the defendant. Of course the stock was not listed, and, at such infrequent sales, such a stock may often sell at very much less than its real value, unless it be protected by people interested in it. Defendant's interest in the bank, both as president and as stockholder, was necessarily great. The fact that he took measures, at his own expense, not at that of the bank, to protect the market standing of its stock against such emergencies, appears to me creditable rather than otherwise.

Again, upon such cross-examination, and in such summing up, much was made of the fact that the defendant did not, within six months of the taking by the bank of any such stock, cause it to be sold at whatever price it might bring. Sub-

division 8 of section 27 of the Banking Law declares that any bank having taken any such stock shall sell or dispose of it within six months under a penalty of forfeiting to the People twice the nominal amount of such stock. The defendant, in extenuation of his such fault, pleaded that the Banking Department " knew of the situation and they did not insist on our doing it (*i. e.*, selling), and it was not feasible to do it." Later in such cross-examination appears the following questions and answers:

" Q. Did you take this bank stock or other bank stock over to the auction room for sale at any time between the time you took the Bogert stock and the time of the closing of the bank? A. Why, certainly not. I try to ruin the bank by forcing this stock on the market? It would have been a nice thing to do. Q. Notwithstanding that the law required it? A. Notwithstanding that the law required it, it would have been a fine thing to do."

In his summing up the district attorney made much of those answers and appealed to the jury to accept them as proof from the defendant's own mouth of his " absolute disregard of the law," and that he " did not care what the law was." No doubt the action of the defendant in not selling such stock within the statutory period of six months was a technical violation of the statute and liable to subject the bank to the penalty therein provided if the public authorities had seen fit to enforce it, but it hardly showed any moral depravity upon the defendant's part, such as to lead him to commit perjury in the report or as a witness.

In short, the cross-examination of the defendant here, at least as to several matters, seems to have been extreme. I am strongly of the opinion that this right of cross-examination upon collateral matters, merely to discredit the defendant witness, is coming to be much abused, at least in criminal cases, and needs to be substantially restricted. Therefore, while I

recognize that the practice must rest largely in the discretion of the trial court, and I would not feel warranted in recommending a reversal here upon that ground alone, I have felt justified in discussing the matter at some length, especially as I am convinced that the defendant here was improperly prejudiced by the conduct of such cross-examination and the use made by plaintiff's counsel of the collateral matters thereby elicited.

We have now come to the final question, whether or not the errors in the conduct of the trial, hereinbefore stated, are sufficient to require the reversal of the judgment and a new trial.

I am convinced that those errors in this case were so numerous, important and to the defendant so prejudicial, and that they so dominated the entire trial that the defendant did not have the fair trial which the Constitution and the laws guarantee to any indicted person. The matters involved in those errors, having been by the rulings of the trial court in effect certified to the jury as competent and material, must by their combined weight have served to annihilate, or at least greatly impair, with them, the credibility of the defendant as a witness, which manifestly was a very important element in the case, especially as bearing upon the problem of defendant's knowledge of the falsity of any particular item specified in the indictment. The summing up of the plaintiff's trial counsel, which if such matters were competent was admirable in tone, character and strength, occupies ninety-six pages of this record and by an approximate estimation at least one-half of those pages are devoted to those matters.

The trial should have been confined to the items specified in the indictment and to the questions whether, as included in the report, they were false in fact and to the then knowledge of the defendant. The trial so limited could not have been over long and would have properly confined the attention of

the jury to the real issues, and might have resulted in the opposite verdict.

No attempt is made here to review in detail the evidence as to any of the specfications, the submission of which to the jury is not herein discussed, as the said errors were so substantial, extensive and various in their character as of themselves to require a reversal and a new trial. It will be the duty of the justice presiding at the new trial, if one be had, to carefully weigh the evidence there given as to each such specification and determine its sufficiency or insufficiency for submission to the jury.

I advise, therefore, that the judgment of the County Court of Kings county be reversed, and that a new trial be granted in the Supreme Court, and to that end that the order remitting an indictment herein from that court to the County Court be reversed.

PUTNAM, J., concurred fully in the opinion except as to the admissibility of the evidence concerning the due date of the bills payable inserted in the copy of the report, and as to the order denying the motion to change the venue, concurred in the result.

THOMAS, J.:

I concur fully in the opinion except as to the admissibility of the evidence concerning the due date of the bills payable inserted in the copy of the report, and as to the order denying the motion to change the venue I concur in the result.

RICH, J.:

I concur, except that I am of the opinion that the defendant's motion for a change of venue ought to have been granted upon all the grounds stated in the moving papers, and vote to to reverse that order upon the ground that the motion was improperly denied.

18

Judgment of conviction of the County Court of Kings county reversed, and new trial granted in the Supreme Court. Order made at the Kings County Special Term of the Supreme Court November 12, 1914, remitting the indictment to the County Court also reversed. Order made at the Special Term of the Supreme Court May 18, 1914, denying defendant's motion to dismiss the indictment, and the order made at such Special Term March 15, 1915, denying defendant's motion to change the venue, are each affirmed.